**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 12-1096**

———————————

UNITED STATES OF AMERICA,

             Plaintiff – Appellee,

   v.

STATE OF SOUTH CAROLINA; NIKKI HALEY, in her official capacity as the Governor of South Carolina,

             Defendants – Appellants,

------------------------------

UNITED MEXICAN STATES; GOVERNMENT OF ARGENTINA; GOVERNMENT OF BOLIVIA; GOVERNMENT OF BRAZIL; GOVERNMENT OF CHILE; GOVERNMENT OF COLOMBIA; GOVERNMENT OF COSTA RICA; GOVERNMENT OF DOMINICAN REPUBLIC; GOVERNMENT OF ECUADOR; GOVERNMENT OF GUATEMALA; GOVERNMENT OF EL SALVADOR; GOVERNMENT OF HONDURAS; GOVERNMENT OF NICARAGUA; GOVERNMENT OF PARAGUAY; GOVERNMENT OF PERU; GOVERNMENT OF URUGUAY,

             Amici Supporting Appellee.

———————————

**No. 12-1099**

———————————

LOWCOUNTRY IMMIGRATION COALITION; MUJERES DE TRIUNFO; NUEVOS CAMINOS; SOUTH CAROLINA VICTIM ASSISTANCE NETWORK; SOUTH CAROLINA HISPANIC LEADERSHIP COUNCIL; SERVICE EMPLOYEES INTERNATIONAL UNION; SOUTHERN REGIONAL JOINT BOARD OF WORKERS UNITED; JANE DOE, No. 1; JANE DOE, No. 2; JOHN DOE, No. 1; YAJAIRA BENET-SMITH; KELLER BARRON; JOHN MCKENZIE; SANDRA JONES,

             Plaintiffs – Appellees,

v.

NIKKI HALEY, in her official capacity as the Governor of South Carolina; ALAN WILSON, in his official capacity as Attorney General of the State of South Carolina,

Defendants – Appellants,

and

JAMES ALTON CANNON, in his official capacity as the Sheriff of Charleston County; SCARLETT A. WILSON, in her official capacity as Solicitor of the Ninth Judicial Circuit,

Defendants.

───────────

**No. 12-2514**

───────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

STATE OF SOUTH CAROLINA; NIKKI HALEY, in her official capacity as the Governor of South Carolina,

Defendants – Appellants.

───────────

**No. 12-2533**

───────────

LOWCOUNTRY IMMIGRATION COALITION; MUJERES DE TRIUNFO; NUEVOS CAMINOS; SOUTH CAROLINA VICTIM ASSISTANCE NETWORK; SOUTH CAROLINA HISPANIC LEADERSHIP COUNCIL; SERVICE EMPLOYEES INTERNATIONAL UNION; SOUTHERN REGIONAL JOINT BOARD OF WORKERS UNITED; JANE DOE, No. 1; JANE DOE, No. 2; JOHN DOE, No. 1; YAJAIRA BENET-SMITH; KELLER BARRON; JOHN MCKENZIE; SANDRA JONES,

Plaintiffs – Appellees,

2

v.

NIKKI HALEY, in her official capacity as the Governor of South Carolina; ALAN WILSON, in his official capacity as Attorney General of the State of South Carolina,

Defendants – Appellants,

and

JAMES ALTON CANNON, in his official capacity as the Sheriff of Charleston County; SCARLETT A. WILSON, in her official capacity as Solicitor of the Ninth Judicial Circuit,

Defendants.

---

Appeals from the United States District Court for the District of South Carolina, at Charleston. Richard Mark Gergel, District Judge. (2:11-cv-02958-RMG, 2:11-cv-02779-RMG, 2:11-cv-02958-RMG, 2:11-cv-02779-RMG)

---

Argued: May 14, 2013                    Decided: July 23, 2013

---

Before DUNCAN, AGEE, and DAVIS, Circuit Judges.

---

Affirmed by published opinion. Judge Davis wrote the opinion, in which Judge Duncan and Judge Agee joined.

---

**ARGUED:** James Emory Smith, Jr., OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellants. Daniel Tenny, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Karen C. Tumlin, NATIONAL IMMIGRATION LAW CENTER, Los Angeles, California, for Appellees. **ON BRIEF:** Alan Wilson, Attorney General, Robert D. Cook, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellants. William N. Nettles, United States Attorney, Columbia, South Carolina, Stuart F. Delery, Principal Deputy Assistant Attorney General, Beth S. Brinkmann, Deputy Assistant Attorney General, Mark B. Stern, Benjamin M. Schultz, Jeffrey E. Sandberg, UNITED STATES DEPARTMENT OF

JUSTICE, Washington, D.C., for Federal Appellee. Linton Joaquin, Nora A. Preciado, Melissa S. Keaney, Alvaro M. Huerta, NATIONAL IMMIGRATION LAW CENTER, Los Angeles, California; Andre Segura, Omar Jadwat, Lee Gelernt, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Cecillia D. Wang, Katherine Desormeau, San Francisco, California, Justin B. Cox, AMERICAN CIVIL LIBERTIES UNION FOUNDATION – IMMIGRANTS' RIGHTS PROJECT, Atlanta, Georgia; Susan K. Dunn, AMERICAN CIVIL LIBERTIES UNION OF SOUTH CAROLINA, Charleston, South Carolina; Victor Viramontes, MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND, Los Angeles, California; Michelle R. Lapointe, Naomi Tsu, Atlanta, Georgia, Samuel Brooke, SOUTHERN POVERTY LAW CENTER, Montgomery, Alabama; Alice Paylor, ROSEN, ROSEN & HAGOOD, Charleston, South Carolina; Foster Maer, LATINO JUSTICE PRLDEF, New York, New York for Appellees Lowcountry Immigration Coalition, Mujeres De Triunfo, Nuevos Caminos, South Carolina Victim Assistance Network, South Carolina Hispanic Leadership Council, Service Employees International Union, Southern Regional Joint Board of Workers United, Jane Doe, No. 1, Jane Doe, No. 2, John Doe, No. 1, Yajaira Benet-Smith, Keller Barron, John Mckenzie, Sandra Jones. Stephen Nickelsburg, Carla Gorniak, Alexander M. Feldman, CLIFFORD CHANCE US LLP, Washington, D.C.; Henry L. Solano, WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP, Denver, Colorado, for The United Mexican States, Amicus Curiae.

———————————

DAVIS, Circuit Judge:

In 2011, the South Carolina legislature passed, and the governor signed, a package of immigration laws known as Act 69 ("the Act"). In this pre-enforcement challenge, the district court preliminarily enjoined Sections 4, 5, and 6(B)(2) of the Act on federal preemption grounds. These sections made it a state criminal offense for (1) a person unlawfully present in the United States to conceal, harbor, or shelter herself from detection, or allow herself to be transported within the state; (2) a third party to participate in concealing, sheltering, or transporting a person unlawfully present in the United States; (3) an alien 18 years or older to fail to carry an alien registration card; and (4) an individual to display or possess a false identification card for the purpose of proving lawful presence. South Carolina ("the State") brings this interlocutory appeal. For the reasons that follow, we affirm.

I.

A.

The South Carolina General Assembly passed the Act, a comprehensive package of laws and regulations regarding immigration, in response to a perceived failure of the United States to secure its southern border and protect its national security. See United States v. South Carolina, 840 F. Supp. 2d 898, 904 (D.S.C. 2011) ("South Carolina I"), remanded for

reconsideration, No. 12-1096, Doc. 72 (4th Cir. Aug. 16, 2012). Legislative supporters of the Act said they hoped the bill would encourage persons unlawfully present in South Carolina to find "a different state to go to." Id. The Act was signed by the governor in 2011 and scheduled to take effect January 1, 2012.

The Act contained twenty sections, only three of which are at issue in this appeal. Subsections 4(A) and (C) make it a state felony for an unlawfully present person to allow himself or herself to be "transported or moved" within the state or to be harbored or sheltered to avoid detection.[1] Violation of those

---

[1] Sections 4(A) and (C) provide, in full:

(A) It is a felony for a person who has come to, entered, or remained in the United States in violation of law to allow themselves to be transported, moved, or attempted to be transported within the State or to solicit or conspire to be transported or moved within the State with intent to further the person's unlawful entry into the United States or avoiding apprehension or detection of the person's unlawful immigration status by state or federal authorities.

. . .

(C) It is a felony for a person who has come to, entered, or remained in the United States in violation of law to conceal, harbor, or shelter themselves from detection or to solicit or conspire to conceal, harbor, or shelter themselves from detection in any place, including a building or means of transportation, with intent to further that person's unlawful entry into the United States or avoiding apprehension or detection of the person's unlawful immigration status by state or federal authorities.

Act 69, 2011 S.C. Acts (S.B. 20); J.A. 106-07.

6

subsections is punishable by a fine not to exceed $5,000, up to five years in prison, or both.

Subsections 4(B) and (D) make it a state felony, also punishable by a fine not to exceed $5,000, up to five years in prison, or both, to "transport, move or attempt to transport" or "conceal, harbor or shelter" a person "with intent to further that person's unlawful entry into the United States" or to help that person avoid apprehension or detection.[2]

---

[2] Sections 4(B) and (D) provide, in full:

(B) It is a felony for a person knowingly or in reckless disregard of the fact that another person has come to, entered, or remained in the United States in violation of law to transport, move, or attempt to transport that person within the State or to solicit or conspire to transport or move that person within the State with intent to further that person's unlawful entry into the United States or avoiding apprehension or detection of that person's unlawful immigration status by state or federal authorities.

. . .

(D) It is a felony for a person knowingly or in reckless disregard of the fact that another person has come to, entered, or remained in the United States in violation of law to conceal, harbor, or shelter from detection or to solicit or conspire to conceal, harbor, or shelter from detection that person in any place, including a building or means of transportation, with intent to further that person's unlawful entry into the United States or avoiding apprehension or detection of that person's unlawful immigration status by state or federal authorities.

Act 69, 2011 S.C. Acts (S.B. 20); J.A. 106-07.

Section 5 makes it a state misdemeanor for any person 18 years or older to "fail to carry" "a certificate of alien registration or alien registration receipt card."[3] A violation of Section 5 is punishable by a fine of not more than $100, up to 30 days' imprisonment, or both.

Subsection 6(B)(2) makes it unlawful for any person to display or possess a counterfeit or false ID for the purpose of providing proof of lawful presences in the United States.[4] Conviction for a first violation of subsection 6(B)(2) is a misdemeanor punishable by a fine of not more than $100 or imprisonment of not more than 30 days. Conviction for a second

---

[3] Section 5 provides, in relevant part:

(A) It is unlawful for a person eighteen years of age or older to fail to carry in the person's possession any certificate of alien registration or alien registration receipt card issued to the person pursuant to 8 U.S.C. Section 1304 while the person is in this State.

Act 69, 2011 S.C. Acts (S.B. 20); J.A. 108.

[4] Section 6(B)(2) provides:

It is unlawful for a person to display, cause or permit to be displayed, or have in the person's possession a false, fictitious, fraudulent, or counterfeit picture identification for the purpose of offering proof of the person's lawful presence in the United States.

Act 69, 2011 S.C. Acts (S.B. 20); J.A. 108-09.

8

offense under the section is a felony punishable by a fine of not more than $500 or imprisonment of not more than five years.

                                    B.

In two separate actions filed in the United States District Court for the District of South Carolina, the Lowcountry Immigration Coalition ("Lowcountry Plaintiffs") and the United States challenged various sections of the Act, largely on preemption grounds. Lowcountry Plaintiffs is a group of individuals and organizations, including the National Immigration Law Center, the Southern Poverty Law Center, and the American Civil Liberties Union of South Carolina.

The district court, after consolidating the cases, found Sections 4, 5, and 6(B)(2) (as well as other subsections of Section 6 not relevant here) were preempted by federal law and issued a preliminary injunction as to those sections. South Carolina I, 840 F. Supp. 2d 898. Before we could hear the State's appeal from that order, the Supreme Court decided Arizona v. United States, 132 S. Ct. 2492 (2012), striking down several provisions of an Arizona law that, inter alia, made it a state crime for an alien to fail to carry an alien registration document and for an unauthorized alien to apply for, solicit, or perform work. We remanded the instant case to the district court for reconsideration in light of Arizona. On remand, the district

court let stand its injunction of Sections 4, 5, and 6(B)(2).[5] United States v. South Carolina, 906 F. Supp. 2d 463, 466-69, 473-74 (D.S.C. 2012) ("South Carolina II").

South Carolina appealed to this Court. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## II.

We "review the decision to grant a preliminary injunction for abuse of discretion. Factual determinations are reviewed for clear error and legal conclusions de novo." E. Tenn. Natural Gas Co. v. Sage, 361 F.3d 808, 828 (4th Cir. 2004). "Faithful to the abuse-of-discretion standard, we are obliged to affirm [a grant of a preliminary injunction when] the district court applied a correct preliminary injunction standard, made no clearly erroneous findings of material fact, and demonstrated a firm grasp of the legal principles pertinent to the underlying dispute." Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balt., --- F.3d ---, No. 11-1111, slip op. at 57 (4th Cir. July 3, 2013) (en banc) (citation and internal quotation marks omitted).

---

[5] The district court had initially enjoined other subsections of Section 6, but dissolved the injunction as to those other sections on remand. See United States v. South Carolina, 906 F. Supp. 2d 463, 470-73 (D.S.C. 2012).

10

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). "The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 525 (4th Cir. 2003).

## III.

Before reaching the merits of this case, we must resolve several threshold issues. South Carolina argues that Lowcountry Plaintiffs do not have a right of action to seek an injunction and that, under Younger abstention, the district court should have declined to hear the case. Both arguments lack merit.

## A.

South Carolina first presses its argument that Lowcountry Plaintiffs do not have a right of action under the Supremacy Clause or 42 U.S.C. § 1983 to bring their claim. (The State does not argue that the United States lacks a right of action.) The State argues that because the Supremacy Clause is not a source of substantive federal rights, it cannot be the basis for a private right of action here. The State leans heavily on Chief Justice Roberts's dissent in Douglas v. Independent Living

11

Center of Southern California, Inc., 132 S. Ct. 1204 (2012), arguing it stands for the proposition that the Supremacy Clause does not create a private right of action.

Douglas concerned three California statutes that reduced payments to Medicaid recipients. Id. at 1208. The state submitted the changes to a federal agency charged with reviewing any changes to how Medicaid payments are calculated. Id. But before the agency could complete its review, groups of Medicaid providers and beneficiaries filed a series of lawsuits seeking to enjoin the reductions on the ground that they were preempted by federal Medicaid law. Id. The Ninth Circuit "ultimately affirmed or ordered preliminary injunctions that prevented the State from implementing its statutes" and "held that the Medicaid providers and beneficiaries could directly bring an action based on the Supremacy Clause." Id. at 1209.

The Supreme Court granted certiorari "to decide whether Medicaid providers and recipients may maintain a cause of action under the Supremacy Clause to enforce a federal Medicaid law." 132 S. Ct. at 1207. But about a month after oral argument in the Supreme Court, the federal agency charged with reviewing the payment change approved the reductions. Douglas, 132 S. Ct. at 1209. That raised the question of whether the plaintiffs should seek review of the agency determination under the Administrative Procedure Act, rather than in a Supremacy Clause challenge, and

12

so the Court remanded for the Ninth Circuit to answer that question. Id. at 1201-11. (The Ninth Circuit has not yet answered the question.) Given the remand based on changed circumstances, the Court explicitly stated that "we do not address whether the Ninth Circuit properly recognized a Supremacy Clause action to enforce this federal statute before the agency took final action." Id. at 1211.

Chief Justice Roberts, joined by Justices Scalia, Thomas, and Alito, dissented in Douglas. He stated that he believed there is no private right of action under the Supremacy Clause to enforce 42 U.S.C. § 1396a(a)(30)(A), the relevant provisions of the Medicaid Act, which requires a state's Medicaid plan and amendments to meet certain standards of efficiency, economy, and quality of care. Noting that the Supremacy Clause is not a source of any federal rights, the Chief Justice stated:

> Indeed, to say that there is a federal statutory right enforceable under the Supremacy Clause, when there is no such right under the pertinent statute itself, would effect a complete end-run around this Court's implied right of action and 42 U.S.C. § 1983 jurisprudence.

Douglas, 132 S. Ct. at 1213 (Roberts, C.J., dissenting).

The Chief Justice distinguished the situation in Douglas from Ex parte Young, 209 U.S. 123 (1908), and its progeny, which "present quite different questions involving the pre-emptive assertion in equity of a defense that would otherwise have been

13

available in the State's enforcement proceedings at law." Douglas, 132 S. Ct. at 1213 (Roberts, C.J., dissenting) (citation and internal quotation marks omitted). He continued, "Nothing of that sort is at issue here; the respondents are not subject to or threatened with any enforcement proceeding like the one in Ex parte Young. They simply seek a private cause of action Congress chose not to provide." Id.

We find no merit in the State's contention. Nothing in the Chief Justice's dissent disturbed the prior holdings of the Supreme Court or circuit courts that have allowed private parties to seek injunctive relief from state statutes allegedly preempted by federal law. A long line of cases confirms this right of action. See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n.14 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve."); Local Union No. 12004, United Steelworkers of Am. v. Massachusetts, 377 F.3d 64, 75 (1st Cir. 2004) ("[I]n suits against state officials for declaratory and injunctive relief, a plaintiff may invoke the jurisdiction of the federal courts by asserting a claim of preemption, even absent an explicit statutory cause of

14

action."); <u>Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury</u>, 445 F.3d 136, 149 (2d Cir. 2006) (Sotomayor, J., majority opinion) (a plaintiff's "right to bring an action seeking declaratory and injunctive relief from municipal regulation on the ground that federal law preempts that regulation is undisputed"); <u>Qwest Corp. v. City of Santa Fe, New Mexico</u>, 380 F.3d 1258, 1266 (10th Cir. 2004) ("A party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action."); <u>Georgia Latino Alliance for Human Rights v. Georgia</u>, 691 F.3d 1250, 1262 (11th Cir. 2012) ("GLAHR") (finding, in a challenge to a Georgia immigration law, that private plaintiffs had a right of action, and stating, "[l]ike the other circuits to address the issue head on, we 'have little difficulty in holding that [Plaintiffs] have an implied right of action to assert a preemption claim seeking injunctive . . . relief'" (quoting <u>Planned Parenthood of Houston & Se. Tex. v. Sanchez</u>, 403 F.3d 324, 334 n. 47, 335 (5th Cir. 2005)).

This Court, too, has allowed private parties to assert preemption claims seeking injunctive relief. See <u>AES Sparrows Point LNG, LLC v. Smith</u>, 527 F.3d 120, 127 (4th Cir. 2008) (finding federal preemption, under the Supremacy Clause, of a local zoning ordinance in a case brought by private companies); <u>Norfolk S. Ry. Co. v. City of Alexandria</u>, 608 F.3d 150, 160 (4th

15

Cir. 2010) (finding preemption, under the Supremacy Clause, of a municipal haul ordinance in case brought by railroad company). As the above cited cases make clear, the State's reliance on the Douglas dissent is misplaced.

We hold that under the Supremacy Clause Lowcountry Plaintiffs have an implied right of action to seek injunctive relief from South Carolina's Act 69 on federal preemption grounds.

B.

South Carolina next argues that the district court should have declined to hear the case under Younger abstention. A district court's decision to decline to abstain under Younger v. Harris, 401 U.S. 37 (1971), is reviewed for abuse of discretion. Life Partners, Inc. v. Morrison, 484 F.3d 284, 301 (4th Cir. 2007).

"Abstention from the exercise of federal jurisdiction is the exception, not the rule." Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976). As a general rule, "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996). One of the limited exceptions to this rule is found in Younger, where the Supreme Court held that federal courts should not stay or enjoin pending state court criminal prosecutions except in

16

special circumstances, such as bad faith or harassment. 401 U.S. at 41, 54. We have explained that Younger applies when the requested relief would interfere with "'(1) an ongoing state judicial proceeding, instituted prior to any substantial progress in the federal proceeding; that (2) implicates important, substantial, or vital state interests; and (3) provides an adequate opportunity for the plaintiff to raise the federal constitutional claim advanced in the federal lawsuit.'" Laurel Sand & Gravel, Inc. v. Wilson, 519 F.3d 156, 165 (4th Cir. 2008) (quoting Moore v. City of Asheville, 396 F.3d 385, 390 (4th Cir. 2005)). As there is no ongoing state judicial proceeding here, Younger abstention is inapplicable.

South Carolina, however, asserts that it is basing its argument on Younger's warning about federal courts enjoining "threatened or anticipated state criminal proceedings." Appellant's Opening Br. 22-23 (emphasis in original).[6] Younger states:

> '[W]hen absolutely necessary for protection of constitutional rights, courts of the United States have power to enjoin state officers from instituting criminal actions. But this may not be done, except under extraordinary circumstances, where the danger of irreparable loss is both great and immediate. Ordinarily, there should be no interference with such officers; primarily, they are charged with the duty of

---

[6] We observe that the word "anticipated" does not appear in Younger.

17

prosecuting offenders against the laws of the state, and must decide when and how this is to be done. The accused should first set up and rely upon his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection.'

Younger, 401 U.S. at 45 (quoting Fenner v. Boykin, 271 U.S. 240, 243-44 (1926)). Those principles, Younger stated, "have been repeatedly followed and reaffirmed in other cases involving threatened prosecutions." 401 U.S. at 45. The State argues that, based on principles of comity and federalism, it is inappropriate for a federal court to enjoin threatened state criminal proceedings when the federal issue could be raised as a defense in a state proceeding.

We disagree. We have held that Younger does not bar the granting of federal injunctive relief when a state criminal prosecution is expected and imminent. Age of Majority Educ. Corp. v. Preller, 512 F.2d 1241, 1243 (4th Cir. 1975) (en banc). We have also drawn a distinction between the commencement of "formal enforcement proceedings," at which point Younger applies, versus the period of time when there is only a "threat of enforcement," when Younger does not apply. Telco Commc'ns, Inc. v. Carbaugh, 885 F.2d 1225, 1229 (4th Cir. 1989), cert. denied, 495 U.S. 904 (1990). In Telco, where a state agency had commenced an investigation of a firm, we held that abstention was not appropriate because the state proceedings were in a

18

preliminary stage. Id. at 1228. We observed that the state's contention – "that abstention is required whenever enforcement is threatened" – "would leave a party's constitutional rights in limbo while an agency contemplates enforcement but does not undertake it." Id. at 1229. Further, if Younger abstention were to apply, "[a] federal plaintiff would be placed 'between the Scylla of intentionally flouting state law and the Charybdis of forgoing what [it] believes to be constitutionally protected activity in order to avoid becoming enmeshed in enforcement proceedings.'" Id. (quoting Steffel v. Thompson, 415 U.S. 452, 462 (1974)) (second alteration in original).

Other circuits have endorsed the Telco reasoning. See, e.g., Guillemard-Ginorio v. Contreras-Gomez, 585 F.3d 508, 519 (1st Cir. 2009) (finding that the Telco rule, "requiring the commencement of 'formal enforcement proceedings' before abstention is required, better comports with the Supreme Court's decisions in Younger and its progeny, in which an indictment or other formal charge had already been filed against the parties seeking relief at the time the federal action was brought"); La. Debating & Literary Ass'n v. City of New Orleans, 42 F.3d 1483, 1490 (5th Cir. 1995) (in a scenario similar to Telco, finding that "Younger abstention was inappropriate because there was no ongoing state proceeding").

19

The Supreme Court has made clear that injunctions of state criminal statutes may be proper when constitutional rights are at issue:

> It is correct that generally a court will not enjoin the enforcement of a criminal statute even though unconstitutional, since such a result seriously impairs the State's interest in enforcing its criminal laws, and implicates the concerns for federalism which lie at the heart of Younger. But this is not an absolute policy and in some circumstances injunctive relief may be appropriate. To justify such interference there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights.

Wooley v. Maynard, 430 U.S. 705, 712-13 (1977) (emphasis added) (citations and internal quotation marks omitted). See also Doran v. Salem Inn, Inc., 422 U.S. 922, 929-31 (1975) (affirming grant of preliminary injunction to two bar owners challenging town ordinance prohibiting topless dancing, finding Younger abstention inapplicable, and holding that, in the absence of a state criminal proceeding, "a plaintiff may challenge the constitutionality of the state statute in federal court, assuming he can satisfy the requirements for federal jurisdiction").

Following our reasoning in Telco, we hold that Younger abstention is inapplicable where, as here, state proceedings have not begun against the federal plaintiffs and the plaintiffs seek injunctive relief to protect their constitutional rights.

20

Plaintiffs need not wait to be arrested under the challenged sections of the Act before they can assert a constitutional claim. They need not live under a cloud of "prolonged uncertainty" as to their rights. Telco, 885 F.2d at 1229. The district court was correct to decline to abstain.

## IV.

We turn now to the merits. The district court issued preliminary injunctions for Sections 4, 5, and 6(B)(2) of Act 69, finding those sections preempted by federal immigration law and regulations. South Carolina II, 960 F. Supp. 2d at 466. The State argues the Act is a proper exercise of its police powers and does not undermine or conflict with federal law. Courts recognize three types of federal preemption: (1) express preemption, in which Congress expressly states its intent to preempt state law, Cox v. Shalala, 112 F.3d 151, 154 (4th Cir. 1997); (2) field preemption, in which Congress occupies a certain field by "regulating so pervasively that there is no room left for the states to supplement federal law," id. (citing Fid. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982)), or where there is a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," Arizona, 132 S. Ct. at 2501 (citation and internal quotation marks omitted); and (3) conflict preemption, arising when state law is preempted "to the

21

extent it actually conflicts with federal law," Cox, 112 F.3d at 154 (citing Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 204 (1983)). The Supreme Court has instructed that conflict preemption "includes cases where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Arizona, 132 S. Ct. at 2501 (citations and internal quotation marks omitted). The district court enjoined Sections 4, 5, and 6(B)(2) under theories of field and conflict preemption.

We note that the presumption against preemption does not apply here because immigration is an area traditionally regulated by the federal government. This Court has declined to apply the presumption against preemption when dealing with a state law that "regulates an area with authorized federal presence," such as national banking. Epps v. JP Morgan Chase Bank, N.A., 675 F.3d 315, 322 (4th Cir. 2012). We further decline to apply the presumption to state laws that concern immigration, an area with extensive federal presence. See Arizona, 132 S. Ct. at 2510 (observing that "[i]mmigration policy shapes the destiny of the Nation" and "[t]he National Government has significant power to regulate immigration").

A.

22

Sections 4(A) and (C) of the Act make it a state felony for an unlawfully present person to allow himself or herself to be "transported or moved" within the state or to be harbored or sheltered to avoid detection. The district court found these subsections essentially criminalize mere presence. South Carolina II, 960 F. Supp. 2d at 467-70. The State argues that these sections do not punish mere unlawful presence because they "require that the illegally present alien take action to transport, harbor or shelter themselves" with the intent to further his or her unlawful entry into the United States or to avoid apprehension or detection. Appellant's Opening Br. 46. South Carolina also presses the argument that these sections only concern "the historic police powers" of the State and thus should be given great deference. Id. at 41.

The Supreme Court recognized in Arizona that "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." 132 S. Ct. at 2505. We are hard-pressed to see how an unlawfully present alien, going about her normal daily life, would be able to avoid violating Sections 4(A) and (C) of the Act. Simply staying in one's home could be viewed as an attempt to "shelter" oneself from detection. Taking a bus or driving home at the end of the workday would be "transport[ing]" oneself to the shelter of one's home to avoid detection. The broad sweep of these sections violates the clear

23

rule of Arizona that unlawful presence is not a criminal offense.

In an analogous case, the Eleventh Circuit affirmed a preliminary injunction against a section of an Alabama statute that prohibited state courts from enforcing a contract to which an unlawfully present alien was a party. United States v. Alabama, 691 F.3d 1269, 1296 (11th Cir. 2012). The court found the statute to be "extraordinary and unprecedented," and criticized its broad sweep: "Essentially, the ability to maintain even a minimal existence is no longer an option for unlawfully present aliens in Alabama." Id. at 1293. In finding the section preempted, the court noted that it burdened "a capability that, in practical application, is essential for an individual to live and conduct daily affairs." Id. at 1294.

In essence, Sections 4(A) and (C) operate to criminalize unlawful presence, a stance plainly at odds with federal law. Under federal law, unlawfully present aliens are subject to civil removal proceedings. See 8 U.S.C. § 1227. "A principal feature of the removal system is the broad discretion exercised by immigration officials." Arizona, 132 S. Ct. at 2499. This discretion is necessary because it "involves policy choices that bear on this Nation's international relations." Id. The State, by criminalizing what Congress has deemed a civil offense and entrusted to the discretion of the executive branch, is

24

"pursu[ing] policies that undermine federal law." Id. at 2510. Sections 4(A) and (C) are thus conflict preempted because they stand as an obstacle to the execution of the federal removal system and interfere with the discretion entrusted to federal immigration officials. They make criminals out of aliens attempting to do no more than go to school, go to work, and care for their families. Cf. Arizona, 132 S. Ct. at 2504 ("[M]aking criminals out of aliens engaged in unauthorized work – aliens who already face the possibility of employer exploitation because of their removable status – would be inconsistent with federal policy and objectives.").

The district court was correct to enjoin Sections 4(A) and (C) because they criminalize actions that Congress has, as a policy choice, decided are a civil matter. We hold that Sections 4(A) and (C) are preempted by federal law.

B.

Sections 4(B) and (D) of the Act make it a state felony to "transport, move or attempt to transport" or "conceal, harbor or shelter" a person "with intent to further that person's unlawful entry into the United States" or to help that person avoid apprehension or detection. The district court found the provisions present "a classic case of field preemption." South Carolina I, 840 F. Supp. 2d at 917. The sections are similar to a federal statute that makes it unlawful to "transport or move"

25

or "conceal[], harbor[] or shield[]" an unlawful alien. 8 U.S.C. § 1324(a)(1)(A)(ii) and (iii). While the federal law authorizes state and local law enforcement officers to make arrests for violations under the statute, prosecution is at the discretion of federal prosecutors and the cases are brought in federal court. Id. § 1324(c).

The State argues that it is possible to comply with both the federal and state harboring laws, and that the state law is not field preempted because the federal regulations do not provide "a full set of standards." Id. Provisions of the United States Code, however, show otherwise. The Immigration and Naturalization Act ("the INA") provides for penalties against third parties engaged in a full set of harboring and transporting offenses: the INA authorizes penalties against those who conceal, harbor, or shield unlawfully present aliens from detection, 8 U.S.C. § 1324(a)(1)(A)(iii); those who encourage or induce aliens to enter the United States without lawful authorization, id. § 1324(a)(1)(A)(iv); those who transport an alien within the United States in furtherance of the alien's violation of federal immigration laws, id. § 1324(a)(1)(A)(ii); and those who assist or conspire in the commission of those acts, id. § 1324(a)(1)(A)(v). There are also penalties for smuggling or otherwise bringing aliens into the United States without lawful authorization, id. §§ 1323,

26

1324(a)(1)(A)(i), 1324(a)(2), and for knowingly aiding or assisting certain inadmissible aliens to enter unlawfully, id. § 1327. The federal government has clearly occupied the field of regulating the concealing, harboring, and transporting of unlawfully present aliens.

The Eleventh Circuit affirmed preliminary injunctions against similar anti-harboring schemes in Alabama and Georgia. See GLAHR, 691 F.3d 1250; United States v. Alabama, 691 F.3d 1269. The court found that Section 7 of Georgia's Illegal Immigration Reform and Enforcement Act of 2011, which made it a state criminal offense to transport, conceal, or harbor a removable alien, was both field and conflict preempted. GLAHR, 691 F.3d at 1263-64. The section was field preempted because "the federal government has clearly expressed more than a 'peripheral concern' with the entry, movement, and residence of aliens within the United States, and the breadth of these laws illustrates an overwhelmingly dominant federal interest in the field." Id. at 1264. The court found the section was conflict preempted because, by allowing for state prosecution of immigration crimes that Congress had confined to federal court, the section "present[ed] an obstacle to the execution of the federal statutory scheme and challenge[d] federal supremacy in the realm of immigration." Id. at 1265.

27

The Eleventh Circuit also affirmed a preliminary injunction of Section 13 of Alabama's Taxpayer and Citizen Protection Act. Section 13 of the statute created state crimes for concealing, harboring, transporting, or shielding an unlawfully present alien. The Eleventh Circuit found the section to be both field and conflict preempted, Alabama, 691 F.3d at 1285-88, and observed that "federal law provides a comprehensive framework to penalize the transportation, concealment, and inducement of unlawfully present aliens," id. at 1285 (citation and internal quotation marks omitted). Alabama, by enacting concurrent state legislation in a field of federal concern, "undermines the intent of Congress to confer discretion on the Executive Branch in matters concerning immigration." Id. at 1287.

We find the Eleventh Circuit's reasoning persuasive. Sections 4(B) and (D) of the Act are field preempted because the vast array of federal laws and regulations on this subject, see supra, slip op. at 24-25, is "so pervasive . . . that Congress left no room for the States to supplement it." Arizona, 132 S. Ct. at 2501 (citation and internal quotation marks omitted). "[W]here the federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation . . . states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement,

28

the federal law, or enforce additional or auxiliary regulations." Hines v. Davidowitz, 312 U.S. 52, 66-67 (1941).

Furthermore, the sections are conflict preempted because "there is a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Arizona, 132 S. Ct. at 2501 (citation and internal quotation marks omitted). We observe that "[t]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities." Id. at 2499. Sections 4(B) and (D) create an obstacle to the smooth functioning of federal immigration law, improperly place in the hands of state officials the nation's immigration policy, and strip federal officials of the authority and discretion necessary in managing foreign affairs.

We hold that Sections 4(B) and (D) of Act 69 are preempted by federal law.

### C.

Section 5 makes it a state misdemeanor for any person 18 years or older to "fail to carry" "a certificate of alien registration or alien registration receipt card issued to the person pursuant to 8 U.S.C. Section 1304." This provision is almost identical to the federal registration statute, 8 U.S.C. §

29

1304(e), which requires every alien in the U.S. over the age of 18 to "at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card" issued under that statute.

In Arizona v. United States, the Supreme Court confronted a similar statute. Section 3 of Arizona's S.B. 1070 forbade the "willful failure to complete or carry an alien registration document . . . in violation of 8 United States Code section 1304(e) or 1306(a)." Ariz. Rev. Stat. Ann. § 11-1509(A) (West Supp. 2011). The Supreme Court held Section 3 to be preempted by federal law. Arizona, 132 S. Ct. at 2503. Detailing the framework and penalties Congress has established for alien registration, the Court found that "the Federal Government has occupied the field of alien registration." Id. at 2502. "Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible." Id.

Accordingly, we hold that Section 5 is field preempted by federal law.

D.

Section 6(B)(2) makes it unlawful for any person to display or possess a false or counterfeit ID for the purpose of proving lawful presence in the United States. Federal law makes it a crime to counterfeit federal immigration documents or to use

30

such documents in an effort to satisfy immigration requirements. 8 U.S.C. § 1324c(a)(1) and (2); 18 U.S.C. § 1546. The district court found that Section 6(B)(2), like Section 5, dealt with alien registration and, following Arizona, was preempted because Congress has occupied the field of alien registration. South Carolina II, 960 F. Supp. 2d at 469.

South Carolina argues that Section 6(B)(2) "should not be encompassed by the alien registration field recognized by Arizona because this statute addresses ordinary fraud." Appellant's Opening Br. 49-50. The State further argues that the presumption against preemption applies to this section because "fraud is an area traditionally for state legislation." Id. at 50. Appellee United States responds that Section 6(B)(2) does not address ordinary fraud but rather "constitutes the State's attempt to enforce federal provisions designed to prevent aliens from circumventing federal immigration law." United States Br. 23. Further, "protecting the integrity of the federal immigration scheme is an exclusively federal function and not the purview of the States." Id. at 23-24.

As an initial matter, when the fraud at issue involves federal immigration documents, the presumption against preemption does not apply. Cf. Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 347 (2001) ("Policing fraud against federal agencies is hardly a field which the States have traditionally

31

occupied . . . .") (citation and internal quotation marks omitted).

As with other immigration-related measures, prosecution for counterfeiting or using federal immigration documents is at the discretion of the Department of Justice acting through the United States Attorney, and allowing the state to prosecute individuals for violations of a state law that is highly similar to a federal law strips federal officials of that discretion. As the Arizona Court observed, "Discretion in the enforcement of immigration law embraces immediate human concerns" and also "involve[s] policy choices that bear on this Nation's international relations." 132 S. Ct. at 2499.

Section 6(B)(2) is field preempted in that Congress has passed several laws dealing with creating, possessing, and using fraudulent immigration documents. See 8 U.S.C. § 1324c(a)(1) and (2); 18 U.S.C. § 1546 (providing penalties up to 25 years' imprisonment). Congress has occupied this field and, in such a case, even complementary or auxiliary state laws are not permitted. See Hines, 312 U.S. at 66-67; Arizona, 132 S. Ct. at 2501-02. In addition, Section 6(B)(2) is conflict preempted because enforcement of these federal statutes necessarily involves the discretion of federal officials, and a state's own law in this area, inviting state prosecution, would "stand[] as

32

an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines, 312 U.S. at 67.

We hold Section 6(B)(2) is preempted by federal law.

V.

To obtain a preliminary injunction, a moving party must establish the presence of the following: (1) "a clear showing that it will likely succeed on the merits"; (2) "a clear showing that it is likely to be irreparably harmed absent preliminary relief"; (3) the balance of equities tips in favor of the moving party; and (4) a preliminary injunction is in the public interest. Real Truth About Obama, Inc. v. Fed. Election Comm., 575 F.3d 342, 346-47 (4th Cir. 2009); W. Va. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave, 553 F.3d 292, 298 (4th Cir. 2009).

We have held that Lowcountry Plaintiffs and the United States have made a clear showing that they are likely to succeed on the merits of their challenge to Sections 4, 5, and 6(B)(2) of Act 69. We further hold that the appellee-plaintiffs have made a clear showing they will likely suffer irreparable harm if an injunction is not granted, that the balance of equities tips in favor of the appellee-plaintiffs, and that preliminary injunctive relief is in the public interest. See South Carolina I, 840 F. Supp. 2d at 924-27. The irreparable injury to the nation's foreign policy if the relevant sections take effect has

33

been clearly established by the United States. And for individual, unlawfully present immigrants and others, the likelihood of chaos resulting from South Carolina enforcing its separate immigration regime is apparent.

## VI.

For the reasons stated, the order of the district court granting a preliminary injunction is

AFFIRMED.