Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2017 CO 98**

**No. 13SC128 Fuentes-Espinoza v. People— Alien Smuggling—Field Preemption—
Conflict Preemption.**

This case requires the supreme court to determine whether Colorado's human
smuggling statute, section 18-13-128, C.R.S. (2017), is preempted by the federal
Immigration and Nationality Act, 8 U.S.C. §§ 1101–1537 (2017) ("INA"). The supreme
court concludes that the INA preempts section 18-13-128 under the doctrines of both
field and conflict preemption.

In reaching this conclusion, the court agrees with a number of federal circuit
courts that have reviewed the same INA provisions at issue here and have determined
that those provisions create a comprehensive framework to penalize the transportation,
concealment, and inducement of unlawfully present aliens and thus evince a
congressional intent to occupy the field criminalizing such conduct. In addition,
applying the analyses set forth in those federal decisions, the court concludes that
section 18-13-128, like the state human smuggling statutes at issue in the federal cases,

stands as an obstacle to the accomplishment and execution of Congress's purposes and objectives in enacting its comprehensive framework.

Accordingly, the supreme court reverses petitioner's judgment of conviction under section 18-13-128.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2017 CO 98

### Supreme Court Case No. 13SC128
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 08CA1231

#### Petitioner:

Bernardino Fuentes-Espinoza,

v.

#### Respondent:

The People of the State of Colorado.

### Judgment Reversed
*en banc*
October 10, 2017

**Attorneys for Petitioner:**
Douglas K. Wilson, Public Defender
Ned R. Jaeckle, Deputy Public Defender
  *Denver, Colorado*

**Attorneys for Respondent:**
Cynthia H. Coffman, Attorney General
John T. Lee, Assistant Attorney General
  *Denver, Colorado*

**Attorneys for Amici Curiae The National Immigration Law Center, Colorado Immigrant Rights Coalition, American Civil Liberties Union of Colorado, and South Carolina Appleseed Legal Justice Center:**
The Meyer Law Office
Hans Meyer
  *Denver, Colorado*

The National Immigration Law Center
Nicholás Espíritu
Melissa Keaney
  *Los Angeles, California*

**JUSTICE GABRIEL** delivered the Opinion of the Court.[*]
**JUSTICE EID** dissents, and **JUSTICE COATS** and **JUSTICE BOATRIGHT** join in the dissent

---

[*] This opinion was originally assigned to another Justice but was reassigned to Justice Gabriel on June 15, 2017.

¶1 In this case, petitioner Bernardino Fuentes-Espinoza challenges his convictions under Colorado's human smuggling statute, section 18-13-128, C.R.S. (2017), on the ground that that statute is preempted by the federal Immigration and Nationality Act, 8 U.S.C. §§ 1101–1537 (2017) ("INA").[1] The court of appeals division below did not consider Fuentes-Espinoza's preemption argument because it was unpreserved. People v. Fuentes-Espinoza, 2013 COA 1, ¶ 16, ___ P.3d ___. We, however, choose to exercise our discretion to review that argument and conclude that the INA preempts section 18-13-128 under the doctrines of both field and conflict preemption.

¶2 In reaching this conclusion, we agree with a number of federal circuit courts that have reviewed the same INA provisions at issue here and have determined that those provisions create a comprehensive framework to penalize the transportation, concealment, and inducement of unlawfully present aliens and thus evince a congressional intent to occupy the field criminalizing such conduct. In addition, applying the analyses set forth in those federal decisions, we conclude that section 18-13-128, like the state human smuggling statutes at issue in the federal cases, stands as

---

[1] Specifically, we granted certiorari to review the following issues:

1. Whether the Immigration and Nationality Act preempts Colorado's human smuggling statute and the trial court therefore was without jurisdiction.

2. Whether the court of appeals erred in holding that the appellant waived the claim that the Colorado human smuggling statute is preempted by the Federal Immigration and Nationality Act.

3. Whether Colorado's human smuggling statute requires the prosecution to prove that the defendant was, in fact, engaged in smuggling humans in violation of the immigration law.

an obstacle to the accomplishment and execution of Congress's purposes and objectives in enacting its comprehensive framework.

¶3 Accordingly, we reverse the division's judgment and remand this case for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶4 In 2007, Fuentes-Espinoza was walking along the Las Vegas Strip when an individual approached him and offered him $500 to drive several family members from Phoenix to Kansas. Fuentes-Espinoza accepted the offer, and he and a friend rode to Phoenix with the man who had made the offer. When the group arrived in Phoenix, Fuentes-Espinoza and his friend were dropped off at an apartment, where they waited for the man to return.

¶5 That evening, the man returned with a van full of people. The man gave Fuentes-Espinoza $600 in travel money, as well as a map that had the man's telephone number on it. Fuentes-Espinoza, his friend, and the people in the van then set off on the trip to Kansas.

¶6 En route, Fuentes-Espinoza stopped at a gas station in Wheat Ridge, Colorado to get gas and to repair a broken taillight. As pertinent here, he went into the station to pay and gave the clerk a one-hundred-dollar bill, which apparently had been included in the travel money that Fuentes-Espinoza had received. The clerk determined that the bill was counterfeit and called the police.

¶7 An officer responded to the gas station, and as he approached, two individuals from the van took off running and, apparently, were not apprehended. The officer then

4

arrived at the station, and after speaking with the clerk, he questioned Fuentes-Espinoza about the counterfeit bill and the people in the van. Fuentes-Espinoza told inconsistent stories about where he had obtained the counterfeit bill and where he was going, and the officer arrested him for passing the bill.

¶8 The officer then spoke with the people in the van and requested identification from them. After doing so, the officer spoke with his supervisor to report on his investigation and to get further instructions. The supervisor told the officer to bring the group to the police station, and the officer did so. The officer then called the human smuggling hotline, and the hotline sent representatives to the station to assist.

¶9 The People ultimately charged Fuentes-Espinoza with one count of forgery (for passing the counterfeit bill) and seven counts of human smuggling in violation of section 18-13-128.

¶10 Under section 18-13-128, a person commits a class 3 felony

> if, for the purpose of assisting another person to enter, remain in, or travel through the United States or the state of Colorado in violation of immigration laws, he or she provides or agrees to provide transportation to that person in exchange for money or any other thing of value.

§ 18-13-128(1), (2). Class 3 felonies carry a presumptive sentencing range of four to twelve years' imprisonment. § 18-1.3-401(1)(a)(V)(A), C.R.S. (2017).

¶11 The case proceeded to trial, and a jury ultimately acquitted Fuentes-Espinoza of forgery but convicted him on each of the human smuggling counts. The court subsequently sentenced him to concurrent four-year terms on each of the seven counts.

¶12  Fuentes-Espinoza appealed, and as pertinent here, he argued for the first time that federal law preempts section 18-13-128. He further asserted that section 18-13-128 required the People to prove that the people he had transported were present in violation of the immigration laws. The division rejected both arguments and, in a split decision, affirmed Fuentes-Espinoza's convictions. Fuentes-Espinoza, ¶¶ 2–3, 61.

¶13  Regarding the preemption issue, the majority concluded that Fuentes-Espinoza's arguments were not properly before the court because Fuentes-Espinoza had not made those arguments before the trial court. Id. at ¶¶ 10–16.

¶14  Regarding the question of what section 18-13-128 required the People to prove, the majority noted that "by including the actor's purpose as an element of the crime, [section 18-13-128] emphasizes the actor's intent, rather than the outcome of his or her actions." Id. at ¶ 30. Thus, in the majority's view, the People were required to prove only that the actor had the purpose of assisting another person to enter, remain in, or travel through the United States or Colorado in violation of immigration laws, and not that the passengers allegedly being smuggled were actually present in the United States or Colorado in violation of those laws. Id. at ¶¶ 27, 39.

¶15  Judge Casebolt dissented. In his view, the division was required to address Fuentes-Espinoza's preemption argument, regardless of whether it was properly preserved, because the argument implicated the court's subject matter jurisdiction. Fuentes-Espinoza, ¶¶ 63–64 (Casebolt, J., dissenting). Alternatively, Judge Casebolt stated that he would review the unpreserved claim for plain error. Id. at ¶¶ 66–67.

¶16 Turning then to the merits of the preemption claim, Judge Casebolt noted that the INA provides "a comprehensive framework to penalize the transportation, concealment, and inducement of unlawfully present aliens." Id. at ¶ 76. In support of this position, he discussed a number of federal circuit court decisions in which the courts had concluded that the INA preempted the state smuggling laws before them under the doctrines of field and conflict preemption. Id. at ¶¶ 76–80. Based on the analyses set forth in those cases, Judge Casebolt concluded that (1) "the INA covers every aspect of the Colorado statute"; (2) in enacting the INA, Congress articulated a "clear purpose of ousting state authority from the field of transporting aliens"; and (3) section 18-13-128 "stands as an obstacle to accomplishing Congress's objective of creating a comprehensive scheme governing the movement and harboring of aliens." Id. at ¶¶ 85–87. Accordingly, he determined that the INA preempted section 18-13-128 under the doctrines of both field and conflict preemption and thus would have reversed Fuentes-Espinoza's conviction. Id. at ¶¶ 82, 91.

¶17 Fuentes-Espinoza then sought, and we granted, certiorari.

## II. Analysis

¶18 We begin by addressing the question of issue preservation and the applicable standard of review. We then discuss the pertinent principles of preemption law, as well as the Supreme Court's decision in Arizona v. United States, 567 U.S. 387 (2012), and other apposite federal authority. Finally, we apply the principles set forth in the foregoing authority and conclude that, like the statutes at issue in those cases, section 18-13-128 is preempted by the INA.

7

## A. Issue Preservation and Standard of Review

¶19 We have long made clear that we will exercise our discretion to review unpreserved constitutional claims when we believe that doing so would best serve the goals of efficiency and judicial economy. See, e.g., Hinojos-Mendoza v. People, 169 P.3d 662, 667 (Colo. 2007); People v. Wiedemer, 852 P.2d 424, 433 n.9 (Colo. 1993). Because we believe that reviewing Fuentes-Espinoza's unpreserved preemption claim would serve those goals here, we exercise our discretion to do so. As a result, we need not consider whether Fuentes-Espinoza waived that claim.

¶20 The question of whether a federal statute preempts state law presents an issue of law that we review de novo. See, e.g., Russo v. Ballard Med. Prods., 550 F.3d 1004, 1010 (10th Cir. 2008); People in Interest of C.Z., 2015 COA 87, ¶ 10, 360 P.3d 228, 233.

## B. Preemption Principles and Pertinent Case Law

¶21 The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. As a result, it has long been settled that Congress has the power to preempt state law. Arizona, 567 U.S. at 399.

¶22 In determining whether federal statutes preempt state law, we are "guided by two cornerstones." Ga. Latino All. for Human Rights v. Governor of Ga., 691 F.3d 1250, 1263 (11th Cir. 2012) (quoting Wyeth v. Levine, 555 U.S. 555, 565 (2009)). First, Congress's purpose is the "ultimate touchstone in every pre-emption case." Id. (quoting Wyeth, 555 U.S. at 565). Second, we must presume that "the historic police

8

powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Id. (quoting Wyeth, 555 U.S. at 565).

¶23 The United States Supreme Court has recognized three forms of federal preemption, namely, express, field, and conflict preemption. See Arizona, 567 U.S. at 399.

¶24 A state law is expressly preempted when Congress "withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision." Id.

¶25 Under the field preemption doctrine, in turn, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." Id. Congress's intent to preempt a particular field may be inferred "from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" Id. (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).

¶26 Finally, under the conflict preemption doctrine, "state laws are preempted when they conflict with federal law." Id. Such a conflict exists (1) when compliance with both federal and state law is physically impossible and (2) in "those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Id. (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

9

¶27 In Arizona, 567 U.S. at 398–407, the Supreme Court applied the foregoing principles in the context of the federal government's regulation of, among other things, alien registration. That case is instructive here.

¶28 In Arizona, the federal government challenged (1) section 5(C) of an Arizona statute, which section made it a misdemeanor for "an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor," id. at 403 (quoting Ariz. Rev. Stat. Ann. § 13-2928(C) (2017)); and (2) section 3 of the same Arizona statute, which prohibited the "willful failure to complete or carry an alien registration document . . . in violation of [federal law]," id. at 400 (quoting Ariz. Rev. Stat. Ann. § 13-1509(A) (2017)). The Supreme Court concluded that federal law preempted both sections. Id. at 403, 406–07.

¶29 Regarding section 5(C), the Court began by noting that the federal Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C. § 1324a (2017), (1) made it illegal for employers knowingly to hire, recruit, refer, or continue to employ unauthorized workers and (2) required employers to verify the employment authorization status of prospective employees. Arizona, 567 U.S. at 404. The Court observed that IRCA enforced these provisions through criminal or civil penalties on employers but that it imposed no criminal sanctions on employees unless they obtained employment through fraudulent means. Id. at 404–05. Employees were principally subject only to civil penalties. Id. at 404.

¶30 In light of the foregoing, the Court concluded that IRCA preempted section 5(C) because enforcing section 5(C) "would interfere with the careful balance struck by

10

Congress with respect to unauthorized employment of aliens." Id. at 406. Notably, in reaching this conclusion, the Court recognized that section 5(C) "attempt[ed] to achieve one of the same goals as federal law—the deterrence of unlawful employment." Id. The Court determined, however, that section 5(C) "involve[d] a conflict in the method of enforcement" because it imposed "criminal penalties on aliens who seek or engage in unauthorized employment," whereas IRCA had rejected such penalties. Id. Accordingly, section 5(C) posed "an obstacle to the regulatory system Congress chose" and, consequently, was preempted under the doctrine of conflict preemption. Id. at 406–07.

¶31 The Court then discussed section 3 of the Arizona statute, which, as noted above, prohibited the "willful failure to complete or carry an alien registration document . . . in violation of [federal law]." Id. at 400. The Court held that this section, too, was preempted, based on the fact that Congress "ha[d] occupied the field of alien registration," thus leaving no room for state regulation. Id. at 401.

¶32 In so ruling, the Court rejected Arizona's argument that section 3 was not preempted because "the provision ha[d] the same aim as federal law and adopt[ed] its substantive standards." Id. at 402. In the Court's view, "[p]ermitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted." Id. Moreover, the penalties imposed by the state statute were inconsistent with those provided by federal law. Id. at 402–03. For example, under federal law, the failure to carry registration papers was a misdemeanor that could be punished by a fine, imprisonment, or a term of probation. Id. at 403

11

(citing 8 U.S.C. § 1304(e) (2017); 18 U.S.C. § 3561 (2017)). The Arizona statute, in contrast, precluded probation as a possible sentence (and also prohibited the possibility of a pardon). Id. (citing Ariz. Rev. Stat. Ann. § 13-1509(D) (2017)). The Court concluded that these conflicts "simply underscore[d] the reason for field preemption." Id.

¶33 Since the Supreme Court's decision in Arizona, a number of federal circuit courts have applied the principles set forth therein to strike down state human smuggling statutes on preemption grounds.

¶34 For example, in Georgia Latino Alliance, 691 F.3d at 1256–57, the plaintiffs challenged several provisions of Georgia's Illegal Immigration and Enforcement Act of 2011. That statute criminalized (1) transporting or moving an "illegal alien," (2) concealing or harboring an "illegal alien," and (3) inducing an "illegal alien" to enter the state of Georgia. Id. at 1263 (citing Ga. Code Ann. §§ 16-11-200(b), 16-11-201(b), 16-11-202(b) (2017)). The Eleventh Circuit concluded that the INA likely preempted each of these provisions. Id. at 1267.

¶35 The court began by noting that "[t]he INA provides a comprehensive framework to penalize the transportation, concealment, and inducement of unlawfully present aliens." Id. Within that framework, 8 U.S.C. § 1324(a)(1)(A)(ii)–(iv) provides that it is a federal crime for any person (1) to transport or move an unlawfully present alien within the United States; (2) to conceal, harbor, or shield an unlawfully present alien from detection; or (3) to encourage or induce an alien to come to, enter, or reside in the United States. Ga. Latino All., 691 F.3d at 1263. In addition, 8 U.S.C. § 1324(c) permits local law enforcement officers to arrest those who violate these provisions of federal

law, but under 8 U.S.C. § 1329, federal courts have exclusive jurisdiction to prosecute these crimes and to interpret the boundaries of the federal statute.  Ga. Latino All., 691 F.3d at 1263–64.  8 U.S.C. § 1324(e) then mandates a community outreach program to "educate the public in the United States and abroad about the penalties for bringing in and harboring aliens in violation of this section."  Ga. Latino All., 691 F.3d at 1264.  And 8 U.S.C. § 1325 imposes civil and criminal penalties for unlawful entry into the United States, and 8 U.S.C. §§ 1323 and 1328 authorize criminal penalties for individuals who bring aliens into the United States and who import aliens for immoral purposes.  Ga. Latino All., 691 F.3d at 1264.

¶36     Construing these provisions together, the Eleventh Circuit concluded that (1) "the federal government has clearly expressed more than a 'peripheral concern' with the entry, movement, and residence of aliens within the United States"; (2) "the breadth of these laws illustrates an overwhelmingly dominant federal interest in the field"; and (3) "Congress has provided a 'full set of standards' to govern the unlawful transport and movement of aliens."  Id.  (quoting DeCanas v. Bica, 424 U.S. 351, 360 (1976); Arizona, 567 U.S. at 401).

¶37     The court further concluded that the Georgia statute presented an obstacle to the execution of the federal statutory scheme.  Id. at 1265.  In support of this conclusion, the court observed that the INA confines the prosecution of federal immigration crimes to federal courts and limits the power to pursue those cases to the United States Attorney, whereas the Georgia statute allowed for parallel state enforcement that was "not conditioned on respect for the federal concerns or the priorities that Congress had

explicitly granted executive agencies the authority to establish." Id. This conflict was exacerbated by the fact that the state statute's enticement provision created a new crime that was unparalleled in the federal scheme. Id. at 1266. And, the court noted, the state statute's provisions concerning harboring and transporting unlawfully present aliens constituted an attempted complement to the INA that was "inconsistent with Congress's objective of creating a comprehensive scheme governing the movement of aliens within the United States." Id.

¶38 In light of the foregoing, the court determined that the plaintiffs had met their burden of showing a likelihood of success on their claim that Georgia's statute was preempted by federal law. Id. at 1267; see also United States v. Alabama, 691 F.3d 1269, 1285–88 (11th Cir. 2012) (relying heavily on Georgia Latino Alliance in concluding that the INA preempted a similar Alabama human smuggling provision).

¶39 In United States v. South Carolina, 720 F.3d 518, 530–32 (4th Cir. 2013), the Fourth Circuit reached a similar result in a case involving a South Carolina law making it a felony (1) to "transport, move or attempt to transport" or to "conceal, harbor or shelter" a person "with intent to further that person's unlawful entry into the United States" or (2) to help that person avoid apprehension or detection. The court reasoned that the pertinent sections were preempted under field preemption principles "because the vast array of federal laws and regulations on this subject is 'so pervasive . . . that Congress left no room for the States to supplement it.'" Id. at 531 (quoting Arizona, 567 U.S. at 399). Additionally, the court concluded that the sections were "conflict preempted" because "there is a federal interest . . . so dominant that the federal system

14

will be assumed to preclude enforcement of state laws on the same subject."  Id. (quoting Arizona, 567 U.S. at 399).[2]

¶40     And in Valle del Sol Inc. v. Whiting, 732 F.3d 1006, 1022–29 (9th Cir. 2013), the Ninth Circuit determined that under both field and conflict preemption principles, the INA preempted an Arizona statute that attempted to criminalize transporting, concealing, harboring, or attempting to harbor an unauthorized alien if the offender knew or recklessly disregarded the fact that the person was in the country illegally. Regarding field preemption, the court agreed with the cases discussed above that the breadth of the federal laws governing the movement and harboring of aliens reflects the federal government's overwhelmingly dominant federal interest in that field.  Id. at 1026.   Regarding conflict preemption, the court concluded that Arizona's statute (1) provided additional and different state penalties for harboring unauthorized aliens than did the INA and thus disrupted Congress's carefully calibrated scheme, (2) divested federal authorities of the exclusive power to prosecute crimes concerning the transportation or harboring of unauthorized aliens, and (3) criminalized conduct not covered by the federal harboring provision.  Id. at 1026–28.  Accordingly, the Arizona statute stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" and therefore was preempted under the conflict preemption doctrine.  Id. at 1026, 1029.

---

[2] We note that the court deemed this a conflict preemption analysis, although Arizona included such an analysis under the rubric of field preemption.

¶41 With the foregoing legal principles and authorities in mind, we turn to the argument now before us.

## C. Application

¶42 Here, Fuentes-Espinoza contends that the INA preempts section 18-13-128 under both field and conflict preemption principles. We agree.

## 1. Field Preemption

¶43 With respect to field preemption, as noted above, we may infer Congress's intent to preempt a particular field when it has created "a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" Arizona, 567 U.S. at 399 (quoting Rice, 331 U.S. at 230). For several reasons, we conclude that such a framework of regulation and such a federal interest exist here.

¶44 First, we note, as did the Supreme Court in Arizona, 567 U.S. at 394–95, that "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens," and "[f]ederal governance of immigration and alien status is extensive and complex."

¶45 Second, we agree with the federal circuit court cases discussed above that the INA established a comprehensive framework for penalizing the transportation, concealment, and inducement of unlawfully present aliens. See Valle del Sol, 732 F.3d at 1026; South Carolina, 720 F.3d at 531; Ga. Latino All., 691 F.3d at 1263.

¶46    For example, 8 U.S.C. § 1324, entitled, "Bringing in and harboring certain aliens," provides:

> [Any person who] knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law [shall be punished as provided in subparagraph (B)].

8 U.S.C. § 1324(a)(1)(A)(ii).

¶47    This statute also (1) criminalizes the aiding or abetting of the above-mentioned conduct, 8 U.S.C. § 1324(a)(1)(A)(v)(II); (2) creates an extensive punishment scheme, see 8 U.S.C. § 1324(a)(1)(B)(i)–(iv); (3) discusses evidentiary considerations for determining whether a violation has occurred, 8 U.S.C. § 1324(b)(3); and (4) mandates the creation of an outreach program to educate the public on the penalties for violations of the foregoing provisions, 8 U.S.C. § 1324(e).

¶48    In addition, the INA imposes civil and criminal penalties on aliens themselves for unlawful entry into the United States, see 8 U.S.C. § 1325, and authorizes criminal penalties for individuals who bring aliens into the United States, aid or assist the entry of inadmissible aliens, or import aliens for immoral purposes, see 8 U.S.C. §§ 1323, 1327, 1328.

¶49    Lastly, 8 U.S.C. § 1324(c) expressly permits local law enforcement officers to arrest those who violate that statute's provisions, but 8 U.S.C. § 1329 expressly grants to United States district courts jurisdiction of all causes brought by the United States that arise under the pertinent subsection and provides that "[i]t shall be the duty of the

United States attorney of the proper district to prosecute every such suit when brought by the United States."

¶50     In our view, when read together, these provisions evince Congress's intent to maintain a uniform, federally regulated framework for criminalizing and regulating the transportation, concealment, and inducement of unlawfully present aliens, and this framework is so pervasive that it has left no room for the states to supplement it. See Arizona, 567 U.S. at 399.

¶51     Accordingly, we conclude that the INA preempts section 18-13-128 under the doctrine of field preemption.

## 2. Conflict Preemption

¶52     We further conclude that the INA preempts section 18-13-128 under the doctrine of conflict preemption.

¶53     As noted above, a state law is preempted under conflict preemption principles when, as pertinent here, the challenged state law stands as an obstacle to the accomplishment and execution of Congress's purposes and objectives in enacting a federal statute. See Arizona, 567 U.S. at 399. Here, for several reasons, we conclude that section 18-13-128 stands as an obstacle to the accomplishment and execution of Congress's purposes and objectives in enacting the INA's various provisions related to the transportation, concealment, and inducement of unlawfully present aliens.

¶54     First, section 18-13-128 conflicts with the INA's carefully delineated scheme for punishing conduct related to the transportation of unlawfully present aliens. For example, a violation of section 18-13-128 carries a minimum sentence of four years and

18

a maximum sentence of twelve years. See § 18-13-128(2) (classifying a violation of the statute as a class 3 felony); § 18-1.3-401(1)(a)(V)(A) (providing the presumptive penalty range for class 3 felonies). In contrast, many of the INA's anti-smuggling provisions do not mandate a minimum term of imprisonment. See, e.g., 8 U.S.C. § 1324(a)(1)(B)(i)–(iv) (providing for fines as one penalty option). Indeed, a violation of the INA's anti-smuggling provisions can result in both a lesser minimum penalty (e.g., a fine) and a lesser maximum penalty than section 18-13-128's presumptive four- to twelve-year sentencing range. See 8 U.S.C. § 1324(a)(1)(B)(i)–(ii), (a)(2)(A), (a)(2)(B).

¶55 Similarly, unlike section 18-13-128, the INA allows offenders who act for the purpose of commercial advantage or private financial gain to be punished differently from those who do not. Compare 8 U.S.C. § 1324(a)(1)(B)(i), with 8 U.S.C. § 1324(a)(1)(B)(ii); and compare 8 U.S.C. § 1324(a)(2)(A), with 8 U.S.C. § 1324 (a)(2)(B)(ii).

¶56 The INA also (1) distinguishes between transportation within the United States and transportation into the United States, see 8 U.S.C. §§ 1324(a)(1)(B)(i)–(ii), 1324(a)(2)(A), and (2) lists circumstances (e.g., knowledge of an alien's intent to commit certain offenses against the United States or a state and the fact that the alien was not immediately on arrival brought and presented to an appropriate immigration officer) that may warrant the imposition of greater or lesser penalties, see 8 U.S.C. § 1324(a)(2)(A), § 1324(a)(2)(B)(i)–(iii). Neither section 18-13-128 nor Colorado's general sentencing statutes specifically identify such circumstances as grounds to impose greater or lesser penalties in the context of alien smuggling.

19

¶57 These differing provisions for punishment stand as an obstacle to the accomplishment and execution of Congress's full purposes and objectives not just because they are different, but because they undermine Congress's careful calibration of punishments for the crimes proscribed. See Valle del Sol, 732 F.3d at 1027 (explaining that the provision of additional and different state penalties under Arizona's statute for harboring unauthorized aliens disrupts the congressional calibration and creates a conflict with Congress's legislative plan).

¶58 Second, section 18-13-128 criminalizes a different range of conduct than does the INA. Under the INA, a person commits alien smuggling if, "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, [that person] transports, or moves or attempts to transport or move such alien within the United States." 8 U.S.C. § 1324(a)(1)(A)(ii) (emphasis added). This language affirmatively requires a defendant to know or recklessly disregard a fact, namely, that the smuggled person "has come to, entered, or remains in the United States in violation of law." Id. As a result, under federal law, the prosecution must prove that "the alien was present in violation of law." United States v. Franco-Lopez, 687 F.3d 1222, 1226 (10th Cir. 2012); see also United States v. Hernandez, 913 F.2d 568, 569 (8th Cir. 1990) (per curiam) (Among other things, "[t]he government was required to prove . . . the alien was in the United States in violation of the law."); United States v. Alvarado-Machado, 867 F.2d 209, 212 (5th Cir. 1989) ("The aliens' status is an element of the crime of transporting illegal aliens.").

¶59 In contrast, as the People assert and the division below determined, Fuentes-Espinoza, ¶¶ 25–39, section 18-13-128 criminalizes certain behavior of people who act with the purpose of assisting others to enter, remain in, or travel through the United States or Colorado in violation of immigration laws. Specifically, as noted above, that statute provides, in pertinent part:

> A person commits smuggling of humans if, for the purpose of assisting another person to enter, remain in, or travel through the United States or the state of Colorado in violation of immigration laws, he or she provides or agrees to provide transportation to that person in exchange for money or any other thing of value.

§ 18-13-128(1) (emphasis added).

¶60 Under the plain language of this statute, a person who acts with the pertinent purpose could be convicted even absent a finding that the alien whom he or she was assisting was actually violating immigration laws. As a result, although, as the People argue, both the federal and state statutes criminalize certain conduct by human smugglers, section 18-13-128 adds a new set of prohibited activities and thus "sweeps more broadly than its federal counterpart." See Valle del Sol, 732 F.3d at 1028–29. In doing so, the Colorado statute disrupts Congress's objective of creating a uniform scheme of punishment because some smuggling activities involving unauthorized aliens are now punishable in Colorado but not elsewhere. See id.

¶61 For these reasons, we conclude that, like the human smuggling statutes invalidated in a number of recent federal circuit court opinions, section 18-13-128 is preempted by the INA under principles of conflict preemption.

21

¶62    We are not persuaded otherwise by the People's contention that any differences between section 18-13-128 and the INA are minor and permissible because section 18-13-128 still "mirrors federal objectives and furthers a legitimate state goal." Plyler v. Doe, 457 U.S. 202, 225 (1982). As the Supreme Court has observed, "The fact of a common end hardly neutralizes conflicting means." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 379 (2000); see also Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge, 403 U.S. 274, 287 (1971) ("Conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy."). Indeed, in Arizona, 567 U.S. at 406, the Court explicitly recognized that although the Arizona statute at issue "attempt[ed] to achieve one of the same goals as federal law — the deterrence of unlawful employment" — this was not enough to save it from preemption because the state statute still involved "a conflict in the method of enforcement."

¶63    The same is true here. Although section 18–13–128 might "mirror" some of the goals and objectives articulated in the INA, it criminalizes distinct conduct and provides for greater penalties than does the INA. Accordingly, section 18-13-128 stands as an obstacle to (1) the calibration of penalties articulated by Congress for punishing the transportation, concealment, and inducement of unlawfully present aliens and (2) the uniformity of enforcement contemplated by the federal scheme.

¶64    We likewise are unpersuaded by the People's attempt to frame the purpose of the INA's human smuggling provisions as being primarily aimed at protecting aliens from the dangers of human smuggling and not at creating a uniform system to penalize the transportation, concealment, and inducement of unlawfully present aliens.

22

Although, as the People assert, 8 U.S.C. § 1324(1)(A)(ii) criminalizes conduct by human smugglers, that provision also reflects Congress's concern with aliens' unlawful conduct.

¶65  Specifically, as noted above, that section provides that any person who

> knowing or in reckless disregard of the fact that an <u>alien</u> has <u>come to, entered, or remains</u> in the United States <u>in violation of law</u>, transports or moves or attempts to transport or move such an <u>alien</u> within the United States by means of transportation or otherwise, <u>in furtherance of such violation</u> of law [shall be punished as provided in subparagraph (B) of that statute].

(Emphasis added.)

¶66  In our view, this language reveals a principal concern with <u>the alien's</u> unlawful conduct.  Thus, the statute punishes third-parties for acting "in furtherance of" the alien's unlawful acts.  We see nothing in this statutory language, however, indicating a congressional intent to protect aliens from human smuggling.

### III.  Conclusion

¶67  For these reasons, we conclude that the INA preempts section 18-13-128 under the doctrines of field and conflict preemption.  Accordingly, the judgment of the court of appeals is reversed, and the case is remanded with instructions that Fuentes-Espinoza's convictions under section 18-13-128 be vacated and for further proceedings consistent with this opinion.

**JUSTICE EID** dissents, and **JUSTICE COATS** and **JUSTICE BOATRIGHT** join in the dissent.

JUSTICE EID, dissenting.

¶68    After today's decision, the State of Colorado can no longer protect the victims of human smuggling operations by declaring human smuggling to be a crime. The majority reasons that Colorado's human smuggling statute, § 18-13-128, C.R.S. (2017), penalizes "the transportation, concealment, and inducement of unlawfully present aliens," and therefore must be preempted by federal law. See maj. op. ¶ 2. The majority, however, misses the point of Colorado's human smuggling statute, which is to protect, not punish, the passengers of human smuggling operations regardless of their immigration status. In this way, the Colorado human smuggling statute is critically different from the federal law on the subject, which focuses on punishing the defendant driver as an aider and abettor of the passenger's violation of federal immigration laws. Because Colorado and federal law do not focus on the same conduct, the Colorado human smuggling statute does not stand as an obstacle to, and is therefore not preempted by, federal law. Accordingly, I respectfully dissent from the majority's opinion holding otherwise.

¶69    The majority first concludes that section 18-13-128 is preempted under principles of field preemption by the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101–1537 (2017). Maj. op. ¶¶ 1, 43. Citing Arizona v. United States, 567 U.S. 387 (2012), the majority notes that the federal government "has broad, undoubted power over the subject of immigration and the status of aliens," and that its "governance of immigration and alien status is extensive and complex." Id. at ¶ 44 (quoting Arizona, 567 U.S. at 394–95). The majority opinion seems to suggest that Arizona could be read

1

for the proposition that the federal government has entirely occupied the field of regulating immigration and alien status, such that any law that might incidentally impact aliens is preempted. See id. at ¶¶ 43–45. But Arizona is not so broad.

¶70 The Supreme Court in Arizona carefully limited its field preemption analysis to the particular field of alien registration. See Arizona, 567 U.S. at 401–03. In addressing section 3 of the Arizona act at issue, which criminalized the failure to carry an alien registration document, the Court explained that federal law "provide[s] a full set of standards governing alien registration." Id. at 401. Further, it concluded that, "with respect to the subject of alien registration, Congress intended to preclude States from 'complement[ing] the federal law,'" id. at 403 (emphasis added) (quoting Hines v. Davidowitz, 312 U.S. 52, 66–67 (1941)). The Court did not hold that Congress has fully occupied all fields in any way connected to aliens or immigration. Indeed, the Supreme Court "has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted." DeCanas v. Bica, 424 U.S. 351, 355 (1976), superseded by statute, Immigration Reform and Control Act of 1986, 100 Stat. 3359, as recognized in Chamber of Commerce v. Whiting, 563 U.S. 582, 588–90 (2011). And while the Court did acknowledge in Arizona that federal law has become more comprehensive since DeCanas, see Arizona, 567 U.S. at 404, again, it was careful to limit its field preemption analysis to the specific field of alien registration. Id. at 403. Because Colorado's human smuggling statute in no way involves alien registration, Arizona simply offers no support for the majority's conclusion that the Colorado human smuggling statute is field preempted.

2

¶71    With regard to other provisions of the Arizona law at issue, the Court in <u>Arizona</u> took a far narrower approach, considering whether each provision at issue conflicted with federal law to such a degree that it "stands as an obstacle" to federal law.  557 U.S. at 405 (quoting <u>Hines</u>, 312 U.S. at 67).  Most relevant here, the Court applied such an approach in addressing section 5(C) of the Arizona law, which made it a state misdemeanor for "an unauthorized alien to knowingly apply for work."  <u>Id.</u> at 403.  The Supreme Court emphasized that the section stood as an obstacle to the regulatory system Congress chose because it ran contrary to a deliberate choice by Congress not to impose criminal penalties on aliens seeking work.  <u>Id.</u> at 404–06.  The Court observed that the legislative background of the relevant federal law, the Immigration Reform and Control Act of 1986, "underscores the fact that Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment."  <u>Id.</u> at 405.  The Court accordingly concluded that, because Congress deliberately chose not to impose criminal penalties on those seeking employment, "[i]t follows that a state law to the contrary is an obstacle to the regulatory system Congress chose."  <u>Id.</u> at 406.

¶72    The question here, then, is whether Congress determined that Colorado should be prevented from criminalizing the conduct that is the focus of the human smuggling statute, such that the statute runs contrary to a deliberate choice by Congress.  The majority opinion offers no reason to believe that Congress possessed such intent when it passed the INA, let alone made a "deliberate choice" in this regard, such as was present in <u>Arizona</u>.

3

¶73 That is because the Colorado human smuggling statute and federal law focus on different conduct. The INA makes it a crime for anyone who, "knowing[ly] or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law." 8 U.S.C. § 1324(a)(1)(A)(ii) (emphasis added). Federal circuit courts have held that under the INA, the prosecution must prove "the fact" that the passenger was in the country in violation of law; the defendant either knew or recklessly disregarded that fact; and the defendant's transportation furthered the passenger's violation of the law. See maj. op. ¶ 58 (discussing the first two elements); see, e.g., United States v. Franco-Lopez, 687 F.3d 1222, 1226–28 (10th Cir. 2012) (listing cases); United States v. Barajas-Chavez, 162 F.3d 1285, 1288–89 (10th Cir. 1999) (en banc) (listing cases). As such, the pertinent provision of the INA is akin to an aiding and abetting statute, with the defendant driver aiding and abetting the passenger's violation of the law.

¶74 By contrast, Colorado's human smuggling act does not require proof that the person transported was traveling in the country in violation of the law. See maj. op. ¶¶ 59–60. Under section 18-13-128, a defendant commits the crime of human smuggling if he provides transportation to a person for money, with the "purpose" of transporting that person in violation of the law, even if that person was not in fact traveling in violation of law. See § 18-13-128(1); maj. op. ¶¶ 59–60. Colorado's statute thus focuses on the conduct of the defendant driver, not on the passenger's status or

4

conduct. In fact, the plain language of the statute indicates the purpose of Colorado's human smuggling statute is the protection, not punishment, of the passenger.

¶75 The majority implicitly recognizes this critical difference between the Colorado human smuggling statute and federal law, but entirely misses its significance. The majority concludes, for example, that under the plain language of the Colorado human smuggling statute, "a person who acts with the pertinent purpose could be prosecuted even absent a finding that the alien whom he or she was assisting was actually violating immigration laws." Maj. op. ¶ 60. In other words, the Colorado human smuggling statute focuses on protecting the victims of human smuggling laws, rather than on the violation of immigration laws. Likewise, the majority concludes that federal law "reflects Congress's concern with aliens' unlawful conduct" in "punish[ing] third-parties for acting 'in furtherance of' the alien's unlawful acts.'" Id. at ¶¶ 64–66. In other words, the focus of the federal law is the unlawful conduct of the passengers and the fact that the defendant driver is helping them accomplish it. Indeed, the majority flat-out declares that federal law does not "indicat[e] a congressional intent to protect aliens from human smuggling." Id. at ¶ 66.

¶76 That is the whole point. Because the federal and state laws take aim at different conduct, there can be no conflict between them. Therefore, there is no evidence that the Colorado human smuggling statute stands as an obstacle to the accomplishment of Congress's purposes.

¶77 The majority largely relies upon several federal circuit court cases that find various state provisions to be conflict and field preempted. See maj. op. ¶¶ 34–40. But

5

the state provisions at issue in those cases mirrored federal law in focusing on immigration law. For example, unlike Colorado's statute, each of the state laws at issue in those cases mirrored the INA's requirement of a defendant's knowledge or reckless disregard of the passenger's unlawful status. The INA, as noted above, provides that any person who "knowing[ly] or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States . . . in furtherance of such violation of law" shall be punished. 8 U.S.C. § 1324(a)(1)(A)(ii). The law at issue in Georgia Latino Alliance for Human Rights v. Governor of Georgia similarly criminalized "knowingly and intentionally transport[ing] or mov[ing] an illegal alien . . . for the purpose of furthering the illegal presence of the alien in the United States." 691 F.3d 1250, 1256, 1263 (11th Cir. 2012) (quoting Ga. Code. Ann. § 16-11-200(b) (West 2017)). The South Carolina law considered by the Fourth Circuit made it a state felony to, "knowingly or in reckless disregard of the fact" that another person is in the country in violation of law, "transport, move, or attempt to transport that person." United States v. South Carolina, 720 F.3d 518, 523 n.2 (4th Cir. 2013) (quoting Act 69, 2011 S.C. Acts (S.B. 20)). And the laws at issue in Valle del Sol, Inc. v. Whiting, 732 F.3d 1006, 1012–13 (9th Cir. 2013), and United States v. Alabama, 691 F.3d 1269, 1277 (11th Cir. 2012), likewise required an offender to know or recklessly disregard the fact that a passenger was in the country unlawfully. Thus, the laws considered in the federal cases, like the INA, focused on violations of immigration law, and therefore stood as an obstacle to federal law.

6

¶78 Indeed, unlike Colorado's human smuggling statute, the state laws at issue in those cases represented broad attempts to regulate immigration. For instance, each law also criminalized other actions resembling those penalized by the INA, see 8 U.S.C. § 1324(a)(1)(A), such as concealing, harboring, or shielding an alien from detection or inducing an alien to enter the state. See Ga. Latino Alliance, 691 F.3d at 1256; Alabama, 691 F.3d at 1277; South Carolina, 720 F.3d at 523; Valle del Sol, 732 F.3d at 1012–13. The state laws were also titled similarly to the relevant provision of the INA,[3] and they were passed as parts of legislative bills with stated immigration-related aims. The Arizona law, for example, was part of a bill "comprised of a variety of immigration-related provisions," which had the stated purpose of "mak[ing] attrition through enforcement the public policy of all state and government agencies in Arizona." Valle del Sol, 732 F.3d at 1012. The Georgia law, as the majority notes, see maj. op. ¶ 34, was included in "the Illegal Immigration Reform and Enforcement Act of 2011," which was intended to "address the problem of illegal immigration within the state,"[4] Ga. Latino Alliance, 691

---

[3] The relevant provision of the INA is titled "Bringing in and harboring certain aliens." 8 U.S.C. § 1324. Arizona's law was titled, in pertinent part, "Unlawful transporting, moving, concealing, harboring or shielding of unlawful aliens." Ariz. Rev. Stat. Ann. § 13-2929 (2014). Alabama's was "Concealing, harboring, shielding, etc., unauthorized aliens," Ala. Code § 31-13-13 (2012); South Carolina's was "Unlawful entry into the United States; furthering illegal entry by or avoidance of detection of undocumented alien; penalties; exceptions," S.C. Code Ann. § 16-9-460 (2012); and the transportation-related portion of Georgia's law was titled "Transporting or moving illegal aliens; penalties," Ga. Code Ann. § 16-11-200 (West 2011).

[4] Similarly, the South Carolina law was a component of an act passed "in response to a perceived failure of the United States to secure its southern border," South Carolina, 720 F.3d at 522, and the Alabama law was included in a bill with the stated purposes of discouraging illegal immigration within the state and maximizing enforcement of federal immigration laws, see Alabama, 691 F.3d at 1276.

7

F.3d at 1256. Under such circumstances, the federal circuit courts found the state laws to constitute impermissible "complements" to the INA. See id. at 1266.

¶79 Because the same circumstances are not present here, the federal circuit cases are simply inapposite. Unlike the state laws at issue in those cases, Colorado's human smuggling statute does not mirror federal immigration law and then attempt to supplement it. Instead, as noted above, Colorado's statute singularly focuses on protecting passengers as the victims of human smuggling operations. As such, it is not an impermissible supplement to federal immigration law, but rather a permissible attempt to address the dangers that human smuggling poses to passengers.

¶80 As the majority points out, there are a number of additional differences between the Colorado human smuggling statute and the INA. Maj. op. ¶¶ 55–56. For example, Colorado's human smuggling statute makes the exchange of "money or any other thing of value" an element of the crime, § 18-13-128, rather than just a consideration in sentencing as it is under the INA, see 8 U.S.C. § 1324(a)(1)(B)(i)–(ii). But these differences simply underscore that the purpose of Colorado's human smuggling statute is to protect passengers from the dangers of human smuggling. Whereas the majority finds it problematic that Colorado's statute criminalizes "a different range of conduct than does the INA," see maj. op. ¶¶ 58–60, the difference in focus between the two statutes instead supports the conclusion that Congress, in enacting the INA, did not intend to preclude states from enacting laws such as Colorado's human smuggling statute.

At bottom, the majority seems to conclude that any deviation from federal law regarding "the transportation of unlawfully present aliens" must be preempted. See maj. op. ¶ 54. But as the Supreme Court has pointed out, state powers are "often exercised in concurrence with those of the National Government." United States v. Locke, 529 U.S. 89, 109 (2000). Indeed, a "high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal act." Whiting, 563 U.S. at 607 (quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 110 (1992) (Kennedy, J., concurring in part and concurring in the judgment)). Because this "high threshold" is far from met in this case, I respectfully dissent.

I am authorized to state that JUSTICE COATS and JUSTICE BOATRIGHT join in this dissent.