# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-50519

United States Court of Appeals
Fifth Circuit

**FILED**
February 23, 2017

Lyle W. Cayce
Clerk

DAVID CRUZ; VALENTIN REYES; JONATHAN RYAN;
BISHOP ENRIQUE SAN PEDRO OZANAM CENTER, INCORPORATED,

Plaintiffs−Appellees,

versus

GREG ABBOTT,
   in His Official Capacity as Governor of the State of Texas;
STEVEN C. MCCRAW,
   in His Official Capacity as Director of Public Safety;
CYNTHIA LEON, In Her Official Capacity
   as Member of the Texas Public Safety Commission, Also Known as Cindy;
FAITH JOHNSON,
   in Her Official Capacity as Member of the Texas Public Safety Commission;
MANNY FLORES,
   in His Official Capacity as Member of the Texas Public Safety Commission;
STEVEN P. MACH,
   in His Official Capacity as Member of the Texas Public Safety Commission;
RANDY WATSON,
   in His Official Capacity as Member of the Texas Public Safety Commission,

Defendants−Appellants.

Appeal from the United States District Court
for the Western District of Texas

No. 16-50519

Before JOLLY, SMITH, and PRADO, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Defendants, who are state officials, appeal a preliminary injunction against the enforcement of a Texas statute prohibiting the harboring of illegal aliens. Because the plaintiffs lack Article III standing, we reverse and render a judgment of dismissal.

I.

In 2015, Texas enacted legislation modifying a section of the Texas Penal Code that deals with human smuggling. Before the 2015 amendments, the Penal Code provided,

> Sec. 20.05. SMUGGLING OF PERSONS. (a) A person commits an offense if the person intentionally uses a motor vehicle, aircraft, or watercraft to transport an individual with the intent to:
> > (1) conceal the individual from a peace officer or special investigator; or
> > (2) flee from a person the actor knows is a peace officer or special investigator attempting to lawfully arrest or detain the actor.[1]

The 2015 amendments, part of House Bill 11 ("HB 11"), added a new basis of liability while limiting the statute's reach to those who smuggle persons with "the intent to obtain a pecuniary benefit." The Penal Code now provides,

> Sec. 20.05. SMUGGLING OF PERSONS. (a) A person commits an offense if the person, with the intent to obtain a pecuniary benefit, knowingly:
> > (1) uses a motor vehicle, aircraft, watercraft, or other means of conveyance to transport an individual with the intent to:
> > > (A) conceal the individual from a peace officer or special investigator; or
> > > (B) flee from a person the actor knows is a peace officer or special investigator attempting to lawfully arrest or

---

[1] Act of May 23, 2011, 82nd Leg., R.S., ch. 223, § 2, sec. 20.05, 2011 Tex. Gen. Laws 799, 799.

No. 16-50519

detain the actor; or

(2) encourages or induces a person to enter or remain in this country in violation of federal law by concealing, harboring, or shielding that person from detection.[²]

That text, which we refer to as HB 11 § 14(a), is the focus of this dispute.³

Plaintiffs claim that HB 11 exposes them to possible criminal liability. Two of them, David Cruz and Valentin Reyes, rent residential property to persons regardless of immigration status. The other two plaintiffs, Jonathan Ryan and Bishop Enrique San Pedro Ozanam Center, Incorporated ("the Ozanam Center"), provide social services to low-income individuals. Ryan is the Executive Director of the Refugee and Immigrant Center for Education and Legal Services ("RAICES"), which offers temporary shelter and legal assistance to people in need, including illegal aliens. The Ozanam Center is a homeless shelter in Brownsville, Texas, that houses persons regardless of immigration status. Ryan and the Ozanam Center expect the individuals they help to perform routine chores, such as sweeping the floor or taking out the trash.

Plaintiffs sued, claiming that the provisions are preempted by federal immigration law and violate the Fourteenth Amendment's Due Process and Equal Protection Clauses.⁴ Plaintiffs immediately moved for a preliminary

---

² Act of May 28, 2015, 84th Leg., R.S., ch. 333, § 14, sec. 20.05, 2015 Tex. Gen. Laws 1508, 1514 (codified at Tex. Penal Code § 20.05).

³ HB 11 also created an offense for "continuous smuggling of persons" (HB 11 § 15(a) (codified at Tex. Penal Code § 20.06) ("A person commits an offense if, during a period that is 10 or more days in duration, the person engages two or more times in conduct that constitutes an offense under Section 20.05.")) and deemed both "smuggling of persons" and "continuous smuggling of persons" to be prosecutable as "organized criminal activity" if committed "with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang" (HB 11 § 16(a)(17) (codified at Tex. Penal Code § 71.02(a))).

⁴ Because we dismiss on standing, we reach none of the substantive issues. One or more parties who have standing are therefore not precluded from bringing these or other claims, on whose merits we express no opinion.

No. 16-50519

injunction to prevent defendants from enforcing HB 11's anti-smuggling provisions. Defendants opposed the motion and moved to dismiss the complaint for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

At the hearing, the district court opined that plaintiffs' conduct "falls right in the heartland of this statute. I mean particularly the individual who rents to and admits that he rents to people that he knows are undocumented aliens . . . . He could be arrested tomorrow." The court instructed defendants to provide a statement explaining the statute's scope and whether it applied to plaintiffs. Defendant Steven McCraw, the Director of the Texas Department of Public Safety ("DPS"), responded that based on the facts in the pleadings, "DPS officials would not investigate, file criminal charges, or otherwise engage in enforcement activity pursuant to the present version of Section 20.05 of the Texas Penal Code against individuals engaged in such conduct."

The court dismissed the Fourteenth Amendment claims but granted a preliminary injunction on the ground that plaintiffs' preemption arguments were likely to succeed on the merits. Defendants filed this interlocutory appeal under 28 U.S.C. § 1292(a)(1).[5]

II.

The Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. CONST., Art III, § 2. "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (footnote omitted) (quoting *Lujan*

---

[5] Defendants' brief claims appellate jurisdiction under 28 U.S.C. § 1291(a)(1), but there is no such subsection.

4

No. 16-50519

*v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "To establish standing, a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Hous. Chronicle Publ'g Co. v. City of League City*, 488 F.3d 613, 617 (5th Cir. 2007).

To satisfy the injury-in-fact requirement, a plaintiff must allege an injury that is "actual or imminent, not conjectural or hypothetical." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (citation and internal quotation marks omitted). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List*, 134 S. Ct. at 2341 (citation and internal quotation marks omitted). But where a plaintiff "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest . . . and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (quoting *Doe v. Bolton*, 410 U.S. 179, 188 (1973)).

Here, standing is reduced to a question of statutory interpretation. The statute says that a person cannot "knowingly . . . encourage[] or induce[] a person to enter or remain in this country in violation of federal law by concealing, harboring, or shielding that person from detection" in exchange for a "pecuniary benefit." HB 11 § 14(a)(2). Plaintiffs urge us to read "harboring . . . from detection" to mean "house" or "shelter" and claim that the provision applies to anyone who "knowingly provid[es] shelter to undocumented immigrants" and receives a "pecuniary benefit" in return. Because the plaintiffs shelter persons without regard to immigration status (and therefore could well be harboring

5

illegal aliens) in return for either money (in the case of the landlords) or labor (in the case of the social-service providers), they say that Section 14(a)(2) applies to them.[6]  The defendants counter that plaintiffs are not violating the statute and therefore face no credible threat of prosecution.  Defendants maintain that the statute applies to persons or entities that hide illegal aliens from authorities, not to those who merely shelter them.[7]

We begin with the plain meaning of the statutory text.[8]  It is obvious from the structure that "harboring" and "from detection" must be read together.  As used in the statute, "harboring" is a transitive verb—it requires an object, and its object is "that person."  The phrase "from detection" modifies "that person."  Therefore, "from detection" modifies and is an element of the offense of "harboring that person."  Although the definition of "harbor" may be ambiguous in isolation,[9] when paired with "from detection" it requires some level of covertness well beyond merely renting or providing a place to live.

Plaintiffs advance several theories.  They note that though Section 14(a)(1) criminalizes flight from "a peace officer or special

---

[6] More specifically, according to the plaintiffs' brief, Cruz and Reyes "have rented to undocumented immigrants and intend to rent to undocumented immigrants in the future." Ryan's refugee center "provides free and low-cost legal services to underserved immigrant[s]." The Ozanam Center "provides . . . shelter and . . . housing . . . regardless of . . . immigration status."

[7] Although concluding that Section 14(a)(2) applies to plaintiffs, the court noted that plaintiffs would lack standing if defendants' interpretation of the statute is correct.

[8] Texas courts aim to give effect to legislative intent, and they "rely on the plain meaning of the text as expressing legislative intent." *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010) (citation omitted). *See Wright v. Ford Motor Co.*, 508 F.3d 263, 269 (5th Cir. 2007) (citations omitted) ("When we interpret a Texas statute, we follow the same rules of construction that a Texas court would apply—and under Texas law the starting point of our analysis is the plain language of the statute.").

[9] "[H]arboring an illegal alien" is "[t]he act of providing concealment from detection by law-enforcement authorities or shelter, employment, or transportation to help a noncitizen remain in the United States unlawfully, while knowing about or recklessly disregarding the noncitizen's illegal immigration status." BLACK'S LAW DICTIONARY 831 (10th ed. 2014).

investigator," Section 14(a)(2) does not include similarly specific language. That is easily explained, however: The drafters of HB 11 modeled Section 14(a)(2) after 8 U.S.C. § 1324(a)(1)(A)(iii), which has the less-specific "from detection" wording. Section 14(a)(1), which predates HB 11, is not modeled on Section 1324.

Plaintiffs claim that "detection" does not necessarily mean detection by law-enforcement personnel. But that reading renders "from detection" super-fluous, given that housing someone always conceals him from detection in the broadest sense of "detection," insofar as outsiders cannot perceive who is inside a given building.[10] Plaintiffs reason that they "harbor" illegal aliens "from de-tection" by failing to report them to authorities after learning of their immigra-tion status. But, as defendants note, there is a middle ground between actively hiding someone and reporting him to law enforcement.

This court interprets the words "harbor, shield, or conceal," which appear in a federal immigration statute, to mean that "something is being hidden from detection." *United States v. Varkonyi*, 645 F.2d 453, 456 (5th Cir. Unit A May 1981).[11] We recently reaffirmed our understanding of that language in *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 529 (5th Cir.

---

[10] Texas courts "presume the Legislature selected language in a statute with care and that every word or phrase was used with a purpose in mind." *Tex. Lottery Comm'n*, 325 S.W.3d at 635 (citations omitted).

[11] Like the Texas statute, the federal statute includes the phrase "from detection." But the placement of "from detection" in the federal statute suggests it may not be modifying "harbor." It imposes penalties on anyone who

> knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation . . . .

8 U.S.C. § 1324(a)(1)(A)(iii). Nevertheless, we read the federal statute as a prohibition on hiding aliens from authorities rather than as a prohibition against housing them.

No. 16-50519

2013) (en banc). Although our precedent is not binding on Texas courts when interpreting Texas statutes, it is reasonable to assume that the legislature was aware of these decisions.[12] A number of other circuits have interpreted similar language to suggest that something is being hidden from detection.[13]

Furthermore, defendant McCraw stated in an affidavit that his agency "would not investigate, file criminal charges, or otherwise engage in enforcement activity" against plaintiffs for "harboring" illegal aliens. As the district court observed, McCraw's statement "does not bind county prosecutors or local law enforcement officers who may choose to enforce section 20.05."[14] Nevertheless, DPS has a major role in the administration of HB 11, and testimony from

---

[12] At issue in *Varkonyi* and *Villas at Parkside* was 8 U.S.C. § 1324, the statute from which HB 11's "harboring . . . from detection" phrasing is drawn (though the language is not identical). Texas courts presume that when the legislature adopts statutory language from another jurisdiction, it does so with the full knowledge of how that language has been interpreted by courts in that jurisdiction. *See Tex. Dep't of Pub. Safety v. Gilbreath*, 842 S.W.2d 408, 412 (Tex. App.—Austin 1992, no writ) ("When the legislature adopts a statute from another jurisdiction it is presumed that the legislature intended to adopt the settled construction given to the statute by the courts of that jurisdiction.") (citing *State v. Wiess*, 171 S.W.2d 848 (Tex. 1943)).

[13] *See United States v. McClellan*, 794 F.3d 743, 751 (7th Cir. 2015) ("[H]arboring 'connot[es] . . . deliberately safeguarding members of a specified group from the authorities, whether through concealment, movement to a safe location, or physical protection.'") (quoting *United States v. Costello*, 666 F.3d 1040, 1044 (7th Cir. 2012)); *United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013) ("The mere act of providing shelter to an alien, when done without intention to help prevent the alien's detection by immigration authorities or police, is thus not an offense under § 1324(a)(1)(A)(iii)."); *DelRio-Mocci v. Connolly Props., Inc.*, 672 F.3d 241, 246 (3d Cir. 2012) ("[T]o the extent that they simply rented apartments to aliens not lawfully present, the Property Managers cannot be said to have committed the crime of harboring."); *United States v. Ozcelik*, 527 F.3d 88, 100 (3d Cir. 2008) ("We agree with the Fifth Circuit that the terms 'shielding,' 'harboring,' and 'concealing' under § 1324 encompass conduct 'tending to substantially facilitate an alien's remaining in the United States illegally' and to prevent government authorities from detecting the alien's unlawful presence.") (quoting *United States v. Rubio-Gonzalez*, 674 F.2d 1067, 1073 (5th Cir. 1982)). *But cf. United States v. Acosta de Evans*, 531 F.2d 428, 430 (9th Cir. 1976) ("We believe that [Section 1324's] purpose is best effectuated by construing 'harbor' to mean 'afford shelter to' and so hold.") (footnote omitted).

[14] Defendants make the colorable argument that there is no redressability because, they contend, plaintiffs did not sue parties with enforcement power. Because we find no

its head confirming that plaintiffs would not be subject to prosecution under HB 11 carries some weight.

Two recent circuit court holdings support plaintiffs' position. In *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013), the court held that a pastor who provided shelter and transportation to illegal aliens had standing to challenge an Arizona statute that prohibited both transporting an illegal alien and "conceal[ing], harbor[ing] or shield[ing] . . . an alien from detection." In *dictum*, the court noted that merely sheltering an alien would have been enough to establish standing. *Id.* at 1017. In *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, 691 F.3d 1250, 1256–58 (11th Cir. 2012) ("*GLAHR*"), the court held that an immigration lawyer who "regularly transports undocumented immigrants to and from court hearings, meets with immigrant clients in his law office, gives legal advice to undocumented immigrants who wish to remain in Georgia, and helps undocumented immigrants to enter Georgia for court business and hearings" had standing to challenge a statute that criminalized transporting illegal aliens and "conceal[ing], harbor[ing] or shield[ing] an illegal alien from detection."

But *Valle del Sol* and *GLAHR* are distinguishable from the present case. They concerned statutes that are significantly different from HB 11, and in both cases, the courts relied in part on statutory language not present in HB 11.[15] Moreover, in *Valle del Sol*, the court interpreted 8 U.S.C. § 1324's

---

standing, there is no need to decide redressability, about which we express no view.

[15] The statute in *Valle del Sol* made it unlawful for a person to "[c]onceal, harbor or shield . . . an alien from detection" but also made it unlawful for a person to "[t]ransport or move or attempt to transport or move an alien in this state, in furtherance of the illegal presence of the alien in the United States" or "[e]ncourage or induce an alien to come to or reside in this state" when that person knows or recklessly disregards the fact that the alien is in the country illegally. *Valle del Sol*, 732 F.3d at 1013. The court found that the plaintiffs had standing because they had provided "transportation and shelter" to illegal aliens. *Id.* at 1015, 1018.

No. 16-50519

harboring language in a way that is inconsistent with this court's more narrow construction, pointing to a larger interpretive disagreement.[16]

## III.

In sum, plaintiffs cannot demonstrate a credible threat of prosecution. On the state of this record, they have not hampered authorities from finding any of the illegal aliens they rent to or serve, nor have they taken steps to help the aliens evade "detection" by the authorities. Because there is no reasonable interpretation by which merely renting housing or providing social services to an illegal alien constitutes "harboring . . . that person from detection," we REVERSE the injunction and RENDER a judgment of dismissal for want of jurisdiction.

---

The statute in *GLAHR* imposed criminal liability on any person who "knowingly and intentionally transports or moves an illegal alien in a motor vehicle for the purpose of fur-thering the illegal presence of the alien," "knowingly conceals, harbors, or shields an illegal alien from detection in any place in [Georgia]," or "knowingly induces, entices, or assists an illegal alien to enter into [Georgia]." *GLAHR*, 691 F.3d at 1256. The court found that an immigration lawyer had standing because he transported aliens, gave them legal advice on how to stay in Georgia, and helped them enter Georgia for court business and hearings. *Id.* at 1258.

[16] *See Valle del Sol*, 732 F.3d at 1017 (suggesting that sheltering an alien in a church would violate 8 U.S.C. § 1324).