

# NUMBER 13-24-00208-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ANNA MERCEDEZ GUTIERREZ,                                    Appellant,

v.

THE STATE OF TEXAS,                                         Appellee.

## ON APPEAL FROM THE 63RD DISTRICT COURT
## OF KINNEY COUNTY, TEXAS

## OPINION

**Before Chief Justice Contreras and Justices Benavides and Silva
Opinion by Chief Justice Contreras**

In the 63rd District Court of Kinney County, appellant Anna Mercedez Gutierrez was convicted of three counts of smuggling of persons, a third-degree felony punishable by a minimum of ten years' imprisonment. *See* TEX. PENAL CODE ANN. § 20.05(a)(1)(A), (b). After she pleaded true to an enhancement paragraph alleging that she was a repeat felony offender, her punishment range was enhanced to that of a second-degree felony,

and she was sentenced to ten years' imprisonment. *See id.* § 12.42(a). On appeal, Gutierrez argues that the statute under which she was convicted is unconstitutional as applied to her because it is preempted by federal immigration law. Because we agree, we will reverse the trial court's judgment and render judgment of acquittal.[1]

## I. BACKGROUND

At around 11:00 p.m. on February 4, 2023, Gutierrez was driving on State Highway 131 near Brackettville when she was stopped by Kinney County Sheriff's Deputy Erica Mendez. Mendez testified at trial that she observed Gutierrez's vehicle speeding and then turning without signaling. When Mendez approached the vehicle, she observed that Gutierrez was the driver, there was a passenger in the front seat, and there were three passengers in the back seat who were "slouching down" "way below" the "seat level or window level" and were not wearing seatbelts. Mendez asked all occupants for identification. Gutierrez provided her driver's license, which reflected that she lived about 350 miles away in Conroe; the passengers provided Mexican identification cards. Mendez noted that the road at issue was usually "[j]ust for ranch and ranchers, local people," and that it is not a road someone would end up on if they "were trying to travel back to Houston" and "accidentally got lost." Mendez testified that, when she asked Gutierrez who the passengers were, Gutierrez "said she didn't know, that she picked them up at a gas station." Mendez said she "radioed for Border Patrol" and she believed that another deputy "transported [the back-seat passengers] to Border Patrol." Over defense counsel's objection, Mendez testified that she decided to arrest Gutierrez "after it was confirmed

[1] This appeal was transferred from the Fourth Court of Appeals in San Antonio pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001(a). We are required to follow the precedent of the transferor court to the extent it differs from our own. TEX. R. APP. P. 41.3.

2

that the three occupants were in the United States illegally."

Gutierrez was indicted on three counts of knowingly using a motor vehicle to transport an individual with intent to conceal the individual from a peace officer. *See id.* § 20.05(a)(1)(A). A jury found her guilty as charged, and she was sentenced to ten years' imprisonment. On February 21, 2024, Gutierrez filed a motion for new trial arguing in part that penal code § 20.05(a)(1)(A) is unconstitutional as it was applied to her because it is preempted by federal immigration law. The Office of the Attorney General was notified of her specific constitutional challenge that same day. *See* TEX. GOV'T CODE ANN. § 402.010.[2] The trial court denied the motion for new trial without a hearing, and this appeal followed.

## II.    DISCUSSION

By her first issue, Gutierrez argues that Texas Penal Code § 20.05(a)(1)(A) is unconstitutional as applied to her because it is preempted by federal immigration law. The constitutionality of a statute is a question of law that we review de novo. *VanDyke v. State*, 538 S.W.3d 561, 570 (Tex. Crim. App. 2017); *see Tex. Mut. Ins. v. PHI Air Med., LLC*, 610 S.W.3d 839, 846 (Tex. 2020) (citing *Baker v. Farmers Elec. Coop.*, 34 F.3d 274, 278 (5th Cir. 1994) ("Preemption is a question of law reviewed de novo.")).

---

[2] Therefore, contrary to the dissent, the Office of the Attorney General was given more than forty-five days' notice of Gutierrez's constitutional challenge, and it had ample opportunity to participate in both the trial court proceedings and the appeal.

Out of an abundance of caution, this Court notified the Office of the Attorney General on November 14, 2024, of the constitutional challenge raised in Gutierrez's appeal. However, we note that a court's obligation to serve notice of a constitutional challenge to the Office of the Attorney General under § 402.010 of the government code is triggered only in the event that "a party to the litigation" files with that court a form promulgated by the Office of Court Administration for that purpose. *See* TEX. GOV'T CODE ANN. § 402.010(a), (a-1). Gutierrez did not file the form contemplated by the statute with this Court; therefore, this Court was not required by the statute to notify the Office of the Attorney General (again) of Gutierrez's constitutional challenge, and § 402.010 does not apply to her appeal.

A party may challenge a statute's constitutionality on its face or as applied to that party. A party bringing a "facial" constitutional challenge must show the statute "operates unconstitutionally in all potential applications." *Estes v. State*, 546 S.W.3d 691, 697–98 (Tex. Crim. App. 2018). "Conversely, in an as-applied challenge, the claimant . . . asserts that the statute is unconstitutional as applied to his particular facts and circumstances." *Id.* at 698 (quoting *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 910 (Tex. Crim. App. 2011)). An "as applied" challenge must be brought during or after a trial on the merits, "for it is only then that the trial judge and reviewing courts have the particular facts and circumstances of the case needed to determine whether the statute or law has been applied in an unconstitutional manner." *State ex rel. Lykos*, 330 S.W.3d at 910.

A party arguing for as-applied preemption has the burden on that issue, *Estes*, 546 S.W.3d at 698, and must raise the issue in the trial court to preserve any error for appeal. *Flores v. State*, 245 S.W.3d 432, 437 n.14 (Tex. Crim. App. 2008); *see* TEX. R. APP. P. 33.1(a). Gutierrez preserved the issue for appeal by raising it in her motion for new trial.

## A. Preemption Generally

The Supremacy Clause of the Sixth Amendment provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. It is a "fundamental principle of the Constitution [] that Congress has the power to preempt state law" under this clause. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

Congress may preempt state law either expressly or implicitly. *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012); *see Horton v. Kan. City S. Ry. Co.*, 692

4

S.W.3d 112, 120 (Tex. 2024). Express preemption "arises when the text of a federal statute explicitly manifests Congress's intent to displace state law." *Alabama*, 691 F.3d at 1281; *see Arizona v. United States*, 567 U.S. 387, 399 (2012). Implicit preemption, at issue in this case, arises when Congress demonstrates an intent to "occup[y] the field" or creates an irreconcilable "conflict" with state law. *Horton*, 692 S.W.3d at 120.

Field preemption arises when "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. Field preemption can be "inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "Where Congress occupies an entire field, . . . even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 401 (noting that "[f]ield preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards").

Conflict preemption arises "where it is impossible for a private party to comply with both state and federal law" or where the challenged state law "stands 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 567 U.S. at 399 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373.

The "ultimate touchstone in every pre-emption case" is the purpose of Congress.

5

*Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Ordinarily, we presume "that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." *Id.* at 565. But we do not apply that presumption when "the State regulates in an area where there has been a history of significant federal presence," such as immigration. *United States v. South Carolina*, 720 F.3d 518, 529 (4th Cir. 2013); *see United States v. Locke*, 529 U.S. 89, 108 (2000).

## B. Applicable Law

Texas Penal Code § 20.05(a) provides:

(a)     A person commits an offense if the person knowingly:

    (1)     uses a motor vehicle, aircraft, watercraft, or other means of conveyance to transport an individual with the intent to:

        (A)     conceal the individual from a peace officer or special investigator; or

        (B)     flee from a person the actor knows is a peace officer or special investigator attempting to lawfully arrest or detain the actor;

    (2)     encourages or induces a person to enter or remain in this country in violation of federal law by concealing, harboring, or shielding that person from detection; or

    (3)     assists, guides, or directs two or more individuals to enter or remain on agricultural land without the effective consent of the owner.

TEX. PENAL CODE ANN. § 20.05(a). Gutierrez was charged and convicted exclusively under § 20.05(a)(1)(A), which creates a third-degree felony punishable by a minimum ten-year prison term. *Id.* § 20.05(b).

In arguing that § 20.05(a)(1)(A) was unconstitutionally applied to her, Gutierrez contends that, by enacting and amending the Immigration and Nationality Act (INA), Congress "established a complete regime to regulate the smuggling of noncitizens,"

6

thereby precluding state regulation in that field. *See Arizona*, 567 U.S. at 395 ("Federal governance of immigration and alien status is extensive and complex."). She cites several cases in which federal courts have found state human-smuggling statutes to be unconstitutional as preempted by the INA. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1012–13 (9th Cir. 2013) (striking down state statute which criminalized transporting, concealing, harboring, or attempting to transport, conceal, or harbor an unauthorized alien, under certain circumstances); *South Carolina*, 720 F.3d at 530 (same where state statute, in relevant part, made it a felony to "transport, move[,] or attempt to transport" or "conceal, harbor[,] or shelter" a person "with intent to further that person's unlawful entry into the United States" or to help that person avoid apprehension or detection); *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1265–67 (11th Cir. 2012) (*GLAHR*) (same where state statute criminalized, among other things, concealing or harboring an illegal alien); *Alabama*, 691 F.3d at 1285–88 (same where state statutes criminalized, among other things: concealing, harboring, or shielding an unlawfully present alien from detection, or attempting to do so; and transporting, attempting to transport, or conspiring to transport an unlawfully present alien); *see also Lozano v. City of Hazleton*, 724 F.3d 297, 316 (3d Cir. 2013) (finding preemption barred city ordinance providing it in part that it is "'unlawful for any person or business entity that owns a dwelling unit in the City to harbor an illegal alien in the dwelling unit, knowing or in reckless disregard of the fact that an alien' is unauthorized").

Gutierrez also cites *Fuentes-Espinoza v. People*, 408 P.3d 445 (Colo. 2017), in which the Colorado Supreme Court held that federal law preempted a state statute which made it a felony "if, for the purpose of assisting another person to enter, remain in, or

7

travel through the United States or the state of Colorado in violation of immigration laws,"

an individual "provides or agrees to provide transportation to that person in exchange for

money or any other thing of value." *Id.* at 447 (quoting COLO. REV. STAT. § 18-13-128(1),

(2)). The court noted that "the INA established a comprehensive framework for penalizing

the transportation, concealment, and inducement of unlawfully present aliens," *id.* at 451,

and that this framework includes a provision that a person commits a federal offense if he

or she,

> (ii)  knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law; [or]

> (iii)  knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation . . . .

8 U.S.C. § 1324(a)(1)(A)(ii), (iii).[3] As the Colorado Supreme Court explained, the INA also

(1) "criminalizes the aiding or abetting of the above-mentioned conduct," (2) "creates an

extensive punishment scheme," (3) "discusses evidentiary considerations for determining

whether a violation has occurred," and (4) "mandates the creation of an outreach program

to educate the public on the penalties for violations of the foregoing provisions." *Fuentes-*

*Espinoza,* 408 P.3d at 452 (citing 8 U.S.C. §§ 1324(a)(1)(A)(v)(II), (a)(1)(B)(i)–(iv), (b)(3),

(e)). Moreover, though § 1324 "expressly permits local law enforcement officers to arrest

those who violate that statute's provisions," *id.* (citing 8 U.S.C. § 1324(c)), the INA grants

federal courts exclusive jurisdiction over "all causes brought by the United States that

---

[3] An offense under 8 U.S.C. § 1324(a)(1)(A)(ii) or (iii) is punishable by a fine or imprisonment for "not more than 5 years, or both." 8 U.S.C. § 1324(a)(1)(B)(ii).

8

arise" thereunder. 8 U.S.C. § 1329. Considering these facts, the *Fuentes-Espinoza* court concluded that the state statute was field-preempted. 408 P.3d at 452 ("In our view, when read together, these provisions evince Congress's intent to maintain a uniform, federally regulated framework for criminalizing and regulating the transportation, concealment, and inducement of unlawfully present aliens, and this framework is so pervasive that it has left no room for the states to supplement it.").

The court also found the state statute to be conflict-preempted. *Id.* at 452–54. The court noted that, though the state statute creates an offense punishable by four to twelve years' imprisonment, "many of the INA's anti-smuggling provisions do not mandate a minimum term of imprisonment," and "a violation of the INA's anti-smuggling provisions can result in both a lesser minimum penalty (e.g., a fine) and a lesser maximum penalty" than a violation of the state statute. *Id.* at 452 (citing 8 U.S.C. § 1324(a)(1)(B)(i)–(ii), (a)(2)(A), (a)(2)(B)). The court further noted that, unlike the state statute, the INA: (1) "allows offenders who act for the purpose of commercial advantage or private financial gain to be punished differently from those who do not"; and (2) "lists circumstances (e.g., knowledge of an alien's intent to commit certain offenses against the United States or a state and the fact that the alien was not immediately on arrival brought and presented to an appropriate immigration officer) that may warrant the imposition of greater or lesser penalties." *Id.* at 452–53 (citing 8 U.S.C. § 1324(a)(1)(B)(i), (a)(1)(B)(ii), (a)(2)(A), (a)(2)(B)(i)–(iii)). The *Fuentes-Espinoza* court observed that "[t]he differing provisions for punishment" in the state statute "stand as an obstacle to the accomplishment and execution of Congress's full purposes and objectives not just because they are different, but because they undermine Congress's careful calibration of punishments for the crimes

9

proscribed." *Id.* at 453.

In response, the State largely relies on *State v. Flores*, in which the Fourth Court of Appeals held that § 20.05(a)(1)(A) was not *facially* preempted, under either a field-preemption theory or a conflict-preemption theory, due to the "neutral language of the statute." 679 S.W.3d 232, 244–45 (Tex. App.—San Antonio, 2023 pet. ref'd). The court noted that, on its face, § 20.05(a)(1)(A) "applies equally to those who smuggle citizens and those who smuggle noncitizens," and "[j]ust because some applications of [the statute] implicate federal immigration priorities does not mean that the statute conflicts with federal law." *Id.* The court concluded that "[t]he statute, as written, does not regulate immigration, was not enacted contrary to the clear and manifest purpose of Congress to occupy the field, and does not operate as an obstacle to the accomplishment of the purposes of Congress." *Id.* at 247; *see State v. Burciaga*, No. 08-23-00034-CR, 2024 WL 3917196, at *9–11 (Tex. App.—El Paso Aug. 23, 2024, pet. filed) (following *Flores* and concluding that § 20.05(a)(1)(A) is not facially preempted, but declining to address appellant's as-applied challenge because it was brought before trial and the record was insufficiently developed).

The *Flores* court contrasted § 20.05(a)(1)(A) with § 20.05(a)(2), which explicitly refers to federal law and which has been found likely unconstitutional by at least one federal district court. 679 S.W.3d at 245 (citing *Cruz v. Abbott*, 177 F.Supp.3d 992, 1014 (W.D. Tex. 2016) (issuing preliminary injunction on basis that § 20.05(a)(2) is preempted by federal law), *rev'd on other grounds*, 849 F.3d 594 (5th Cir. 2017)). The *Flores* court remarked that, though the *facial* conflict-preemption claim raised there lacked merit, such a claim "may be persuasive in the context of a preemption-as-applied challenge." *Id.* at

247. That is the challenge Gutierrez brings in this case of first impression. *See Burciaga*, 2024 WL 3917196, at *13 (Alley, C.J., concurring) (noting that an as-applied challenge to § 20.05(a)(1)(A) has not been resolved by any Texas court).

**C.    Analysis**

We agree with the apparently unanimous view of courts nationwide that, by enacting and amending the INA, Congress's purpose was to create a "comprehensive framework" governing not only unauthorized immigration itself, but also "the transportation, concealment, and inducement of unlawfully present aliens." *GLAHR*, 691 F.3d at 1263; *see Valle del Sol Inc.*, 732 F.3d at 1024–25 (noting that the INA's "scheme governing the crimes associated with the movement of unauthorized aliens in the United States" provides "a full set of standards" designed to work as a "harmonious whole"); *South Carolina*, 720 F.3d at 531; *Fuentes-Espinoza,* 408 P.3d at 452; *see also Burciaga*, 2024 WL 3917196, at *26 (Soto, J., dissenting) ("[B]y enacting a comprehensive framework for penalizing smuggling undocumented noncitizens in the country illegally, Congress made combating such central to its immigration policies."). The "pervasive" nature of the statutory scheme illustrates this intent. *See GLAHR*, 691 F.3d at 1263; *Valle del Sol Inc.*, 732 F.3d at 1024–25; *South Carolina*, 720 F.3d at 530–32; *Fuentes-Espinoza,* 408 P.3d at 452; *see also Arizona*, 567 U.S. at 397.

This intent is also demonstrated by the history of the enactment and amendment of the INA:

> Prior to 1917, predecessor statutes to § 1324(a)(1) criminalized only the bringing in or landing of undocumented aliens into the United States. In 1917, Congress addressed an apparent gap in federal immigration law with the extension of immigration enforcement efforts inland by additionally proscribing the harboring and concealing of undocumented aliens.
>
> By 1952, heightened concern for economic displacements caused by the

11

growing influx of undocumented alien workers from Mexico prompted Congress to undertake a comprehensive recodification of federal immigration enforcement laws. Seeking to "strengthen the law generally in preventing aliens from entering or remaining in the United States illegally," Congress broadened the coverage of the 1917 immigration legislation by creating [in the March Act, codified as amended at 8 U.S.C. § 1324(a)(1),] the additional offenses of transporting aliens within the United States and inducing or encouraging the entry of aliens into the United States.

Of particular concern here, congressional debate regarding the March Act suggests that the transport offense was directed, in large part, at curbing the widespread practice of transporting illegal immigrants, already in the United States, to jobs and locations away from the border where immigration enforcement resources may have been more scarce. Thus, as in 1917, the congressional purpose underlying the creation of additional smuggling offenses appears to have been a remedial one of closing perceived gaps in federal immigration enforcement laws.

*United States v. Sanchez-Vargas*, 878 F.2d 1163, 1168–69 (9th Cir. 1989) (citations omitted); *see Valle del Sol Inc.*, 732 F.3d at 1025 (observing that the INA's "slow evolution over time demonstrates Congress's intentional calibration of the appropriate breadth of the law and severity of the punishment" for alien smuggling); *see also Arizona*, 567 U.S. at 395 (noting that "[i]t is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States"); *Burciaga*, 2024 WL 3917196, at *26 (Soto, J., dissenting) ("[O]ne can reasonably infer from the comprehensive nature of Congress's regulations in this field that Congress intended for the prosecution of individuals found transporting and harboring aliens unlawfully in the country to remain in the hands of federal authorities to ensure the uniform enforcement of its regulations.").

In *Flores*, the Fourth Court of Appeals determined that § 20.05(a)(1)(A) was not *facially* preempted by this "comprehensive framework" because it uses neutral language—that is, it criminalizes the concealment of a person from police by

transportation (human smuggling) regardless of what the reason for the concealment is. 679 S.W.3d at 245–46; *see* TEX. PENAL CODE ANN. § 20.05(a)(1)(A). Accordingly, § 20.05(a)(1)(A) *could be* applied without infringing on the field occupied by the INA—for example, it *could* be used to charge a person with smuggling a lawfully-present robbery suspect. This characteristic makes § 20.05(a)(1)(A) distinguishable from the statutes held to be facially preempted in the cases cited by Gutierrez, which all specifically referenced the smuggled person's immigration status. *See GLAHR*, 691 F.3d at 1256; *Alabama*, 691 F.3d at 1285; *Valle del Sol Inc.*, 732 F.3d at 1013; *South Carolina*, 720 F.3d at 530; *Fuentes-Espinoza*, 408 P.3d at 447. Because it does not "operate[] unconstitutionally in all potential applications," the *Flores* court was correct to conclude that § 20.05(a)(1)(A) is not facially preempted. *See Flores*, 679 S.W.3d at 244; *Estes*, 546 S.W.3d at 697–98.

But an "as-applied" preemption analysis is different. In such an analysis, we must "consider[] the degree to which a specific scenario conflicts with requirements and objectives of the federal law at issue." *Horton*, 692 S.W.3d at 133. The State argues that the statute is not preempted in this "specific scenario" in part because Gutierrez "does not allege facts showing an immigration motive" in the application of the statute to her. The State also contends that

> [t]he tangential immigration facts in this case only serve as one methodology to satisfy the smuggling statute, just like smuggling a group of underage girls for sex trafficking is one way to offend the smuggling statute. One could not reasonably argue that the smuggling statute is discriminatory and violates equal protection simply because only female victims were involved.

The latter sentiment may be true, but one *could* reasonably argue that the statute would be *preempted* if the federal government had established a "comprehensive framework" governing the smuggling of sex trafficking suspects, as it has in the field of immigration-

13

related smuggling. *See GLAHR*, 691 F.3d at 1263; *see also Lozano*, 724 F.3d at 316 (agreeing that "the federal government has clearly expressed more than a 'peripheral concern' with the entry, movement, and residence of aliens within the United States" and that "the breadth of these laws illustrates an overwhelmingly dominant federal interest in the field").

More to the point, we do not agree that Gutierrez failed to "allege facts showing an immigration motive" or that the "immigration facts" in this case are "tangential." Gutierrez points to Mendez's trial testimony as evidence that her prosecution is preempted. As noted, Mendez testified that, on the night February 4, 2023, she pulled Gutierrez over for speeding and failing to signal a turn. After Gutierrez stopped, Mendez approached Gutierrez's car and noticed "three occupants in the backseat" who were "slouching down" and who were only visible with her use of a flashlight. Mendez requested identification, and Gutierrez and her front-seat passenger produced their Texas driver's licenses. Because the rear passengers were "slouching down" and "were not wearing seatbelts," Mendez requested identification from them as well, and they produced "Mexican I.D. cards."[4] Gutierrez told Mendez she picked up the back-seat passengers at a gas station and did not know who they were; Mendez agreed that, in her experience, this behavior was "consistent with smuggling." At that point, Mendez "radioed for Border Patrol."

Mendez agreed with the prosecutor that, "[b]ased on everything that [she] saw that night, [she] fe[lt] that there was a human smuggling event going on." The following colloquy then occurred:

> Q. [Prosecutor]    Okay. And, I'm sorry, did you say that at some point

---

[4] The driver's licenses of Gutierrez and her front-seat passenger were entered into evidence at trial, but the identification cards of the back-seat passengers were not. When asked whether she took a photo or made a copy of the back-seat passengers' identification cards, Mendez replied: "I don't recall."

you made a decision to arrest Ms. Gutierrez and her [front seat passenger]?

A. [Mendez]    Yes, *after it was confirmed that the three occupants were in the United States illegally*.

Q.    Okay. . . . Did you also make that decision based on the time of night?

A.    Yes.

Q.    Okay. The road they were traveling?

A.    Yes.

Q.    Okay. The fact that people were slouching down?

A.    Yes, ma'am.

(Emphasis added.) On cross-examination, Mendez confirmed that she called Border Patrol in order "to identify if [the back-seat passengers] were here illegally." She also recalled that Gutierrez told her that she "didn't know that they were illegal aliens" and that "they were going to pay for her fuel." On re-direct, Mendez was asked: "[W]hen you identified the back passengers by their Mexican I.D. cards, did that indicate to you that they were not residents of the United States?" She replied: "Possibly. That's the reason why the Border Patrol, you know, tried to confirm that."

It is true, as the State notes, that it did not need to allege the immigration status of the back-seat passengers in order to charge Gutierrez under § 20.05(a)(1)(A), and it did not need to prove their status to convict her. Instead, under § 20.05(a)(1)(A), the State only had to allege and prove that, using a motor vehicle, Gutierrez transported an individual with the intent to conceal that individual from law enforcement. *See* TEX. PENAL CODE ANN. § 20.05(a)(1)(A). But from the record in this case, it is clear that the immigration status of Gutierrez's back-seat passengers was the central fact upon which her arrest and prosecution were based. Mendez acknowledged that she was aware of facts

15

indicating Gutierrez was engaged in human smuggling—i.e., that she was violating of the statute—based on the time of day, the location, and the position of the passengers in the back seat. Nevertheless, she called Border Patrol for the express purpose of determining the passengers' immigration status, and she did not arrest Gutierrez until it was confirmed that the passengers were present in the country illegally. Although the passengers' immigration status was not a required statutory element of the offense, it was a necessary showing in this case because the State substantially relied on this fact in establishing Gutierrez's intent to conceal, which is an element of the offense. *See id.* This is demonstrated by the fact that the State emphasized the passengers' immigration status at closing, stating:

> So let's talk about what's reasonable, what's normal, what's legal. Is it normal to drive down 131? Is it reasonable to drive down 131? Sure. Is it legal? Sure. . . . You know what's not legal, what's not normal and what's not reasonable? Is when you have three back passengers slouched down so far beyond the window and the seats that nobody can see them and they turn out to be illegal aliens.
>
> . . . .
>
> All I have to prove to you is that Anna Gutierrez . . . used her vehicle from wherever she's from in Conroe, Texas, she came to Kinney County, Texas, on a road that nobody uses with three illegal aliens concealed in the back of her car.

Even though the State charged her using the neutral language of § 20.05(a)(1)(A), the record demonstrates that she was in fact prosecuted for her transportation and concealment from law enforcement of undocumented noncitizens. This is a field which is governed by a "pervasive" federal statutory framework and in which there is a "dominant" federal interest, thereby precluding even complementary state regulation. *See Lozano*, 724 F.3d at 316; *GLAHR*, 691 F.3d at 1263; *Valle del Sol Inc.*, 732 F.3d at 1023 (noting that "[f]ederal control over immigration policy is integral to the federal government's ability

16

to manage foreign relations"); *South Carolina*, 720 F.3d at 531; *Fuentes-Espinoza,* 408 P.3d at 452; *see also Arizona*, 567 U.S. at 401. Therefore, under the particular facts and circumstances demonstrated in the record, we conclude that penal code § 20.05(a)(1)(A) is field-preempted as it was applied to Gutierrez. *See Burciaga*, 2024 WL 3917196, at *27–28 (Soto, J., dissenting) (concluding that, "because the undisputed evidence . . . demonstrates that the State is attempting to apply [§ 20.05(a)(1)(A)] to prosecute Burciaga for his conduct in transporting and concealing undocumented noncitizens from law enforcement," the statute is preempted by the INA as applied to his prosecution).

Moreover, in light of the different punishment schemes and evidentiary standards provided for by the INA as opposed to state law, we conclude that § 20.05(a)(1)(A) is conflict-preempted it was as applied to Gutierrez in this case. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990) (noting that categories of preemption are not "rigidly distinct" and that "field preemption may be understood as a species of conflict pre-emption" because "[a] state law that falls within a pre-empted field [necessarily] conflicts with Congress' intent . . . to exclude state regulation."). Specifically, had Gutierrez been prosecuted for the same conduct under the analogous federal statute, the prosecution would have had to prove that she "kn[ew]" or was "in reckless disregard of the fact" that her passengers "ha[d] come to, entered, or remain[ed] in the United States in violation of law"; and if convicted, Gutierrez would have been subject to a lower punishment range. *See* 8 U.S.C. § 1324(a)(1)(A)(ii), (iii), (B)(i). The prosecution in this case therefore "undermine[s] Congress's careful calibration of punishments for the crimes proscribed." *Fuentes-Espinoza*, 408 P.3d at 453; *see Crosby*, 530 U.S. at 380 (noting that "[c]onflict

17

is imminent" when "two separate remedies are brought to bear on the same activity").

We sustain Gutierrez's first issue.[5]

### III.    CONCLUSION

The State undoubtedly has a compelling interest in deterring, policing, and prosecuting the offense of human smuggling, and that interest is not diminished when the offense concerns the smuggling of individuals who are suspected to have entered the United States illegally. However, the State has suggested no reason why prosecution in federal court would be inadequate to protect the interests of its citizens in this or any similar case. *See* 8 U.S.C. §§ 1324, 1329.[6] In any event, we are not at liberty to ignore the mandates of the United States Constitution and the long-standing authority establishing that Congress may implicitly preempt state regulation in a given field. *See, e.g., Crosby*, 530 U.S. at 372; *see also GLAHR*, 691 F.3d at 1269 ("[W]hen state laws intrude into areas of overwhelming federal interest and erode the discretion implicit in the sovereignty of the country, we must recognize the supremacy of federal law."). For the reasons set forth above, that authority compels us to conclude that Gutierrez's prosecution in this case is an unconstitutional application of Texas Penal Code § 20.05(a)(1)(A).

The trial court's judgment of conviction is reversed, and we render judgment of acquittal. Because it is necessary in order to expedite the decision, Texas Rule of

---

[5] Gutierrez also argues on appeal that (1) the trial court erred by denying her requests to strike two venire members for cause; (2) testimony regarding the immigration status of her passengers violated her right to confront witnesses; and (3) testimony regarding the nationality of her passengers was improperly admitted hearsay. In light of our conclusion herein, we need not address these issues. *See* TEX. R. APP. P. 47.1.

[6] It is undisputed that Gutierrez could have been prosecuted federally under the facts of this case. By suggesting that human smuggling would be "tolerated" or that any its victims would be "left unprotected" under our ruling, the dissent betrays a belief that the federal government is somehow incapable or unable of enforcing its own criminal laws. Those purported concerns are hyperbolic and unfounded.

Appellate Procedure 49 is suspended in this case, and no motion for rehearing or motion for en banc reconsideration will be entertained. TEX. R. APP. P. 2 (allowing an appellate court, on its own initiative, to "suspend a rule's operation in a particular case and order a different procedure" in order "to expedite a decision" or for "good cause," with certain exceptions not applicable here).

DORI CONTRERAS
Chief Justice

Dissenting Opinion by Justice Silva.

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
16th day of December, 2024.